**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**BANCA DELLA SVIZZERA ITALIANA and Certain Purchasers of Call Options for the Common Stock of St. Joe Minerals Corporation, Defendants.**

**81 Civ. 1836 (MP).**

United States District Court,
S. D. New York.

Nov. 16, 1981.

Robert B. Blackburn, New York City, Sonya T. Still, Jersey City, N. J., Jonathan M. Harris, New York City, of counsel for Securities and Exchange Commission.

Willkie, Farr & Gallagher, New York City, for defendant; Chester J. Straub, David G. Trachtenberg, Mitchell J. Auslander, New York City, of counsel.

## DECISION

MILTON POLLACK, District Judge.

Plaintiff, Securities Exchange Commission ("SEC"), moves this Court for an appropriate order pursuant to Fed.R.Civ.P. 37 for the failure and refusal of defendant, Banca Della Svizzera Italiana ("BSI") to provide the SEC with information relative to the identities of the principals for whom it purchased stock and stock options on American exchanges in St. Joe Minerals Corporation ("St. Joe"), a New York corporation which produces natural resources.

The underlying law suit is an action by the SEC against the said defendant and unnamed others for an injunction and an accounting for violations of the insider trading provisions of the Securities Exchange Act of 1934, Sections 10(b) and 14(e), 15 U.S.C. §§ 78j(b) and n(e) and Rules 10b–5 and 14e–3 promulgated thereunder.

Authority to bring this action resides in Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d). Jurisdiction of the Court is posited under Sections 21(e) and 27 of the Exchange Act, 15 U.S.C. §§ 78u(e) and 78aa.

Jurisdiction over BSI exists by virtue of BSI's doing business here. There is evidence in the record that BSI operates in New York at 44 Wall Street through a subsidiary corporation. This was denied by counsel for BSI at the hearing but a letter to the contrary signed some time ago by BSI, a copy of which was furnished to the Court by the SEC indicates that the denial was erroneous and obviously was inadvertent.

The issue posed to the Court is whether to compel a foreign party which transacted purchases on American securities exchanges to make discovery and answer interrogatories concerning its undisclosed principals where the acts of disclosure might subject that party to criminal liability in its home country. The Court has carefully balanced the interests at stake and considered the resisting party's professed good faith. It concludes that compelling the complete discovery demanded is not only justified in the instant case but required to preserve our vital national interest in maintaining the integrity of the securities markets against violations committed and/or aided and assisted by parties located abroad. Accordingly, an order should issue requiring full responses to the SEC's interrogatories.

*The Facts*

This action alleges insider trading on the part of BSI and its principals in the purchase and sale of call options for the common stock as well as the common stock itself of St. Joe. The options were traded through the Philadelphia Stock Exchange and the stock was traded on the New York Stock Exchange both of which are registered national exchanges. The purchases in question were made immediately prior to the announcement on March 11, 1981 of a cash tender offer by a subsidiary of Joseph E. Seagram & Sons, Inc. ("Seagram"), an Indiana corporation for all of the common stock of St. Joe at $45 per share. Prior to the announcement of the tender offer St. Joe stock traded on the market at $30 per share, (approximately).

The orders for the call options and the stock were placed close to the opening of trading on the exchanges on March 10, 1981, one day prior to Seagram's offer and

announcement, at prices above the last quoted market price for the options and the stock. The options were due to expire in ten days, thereby significantly indicating an expectation that the price of St. Joe common stock would rise substantially and imminently.

BSI succeeded in purchasing approximately 1055 call options which carried the right to purchase 105,500 shares of St. Joe common stock and in purchasing 3,000 shares of the St. Joe common stock. On the next day the stock opened sharply higher in price and the bank shortly instructed its brokers to close out the purchases of the options and sell 2,000 of the 3,000 shares of common stock acquired. These transactions resulted in a virtually overnight profit just short of $2 million.

Promptly on noticing the undue activity in the options market, the SEC investigated and based on its findings brought this suit. The SEC contends that there is a strong probability that the purchasers were unlawfully using material non-public information which could only have been obtained or misappropriated from sources charged with a confidential duty not to disclose information prior to the public announcement of the tender offer.

The SEC applied for and obtained a Temporary Restraining Order against the Irving Trust Company which held the proceeds of the sales of the options and of the common stock in BSI's bank account with Irving Trust. The Temporary Restraining Order also directed immediate discovery proceedings including the requirement that "insofar as permitted by law" BSI should disclose within three business days the identity of its principals. The effect of the Temporary Restraining Order was to immobilize the profits derived from the questioned transactions.

The SEC endeavored by one or another procedural means, here and abroad, to obtain the identity of those who, along with the bank, were involved in the particular options purchases. No disclosure was forthcoming. Explanatory but uninformative letters so far as concerned the identity of the principals were received by the SEC from time to time. The SEC served formal interrogatories which were refined at the Court's suggestion to target the demanded disclosure in simplest terms. Conferences were held with the Court at which explanations were supplied and it was made clear at these that if need be an appropriate order enforceable by appropriate but, to the bank, unpalatable sanctions, might follow any continued impasse. Nonetheless, BSI declined to furnish the requested information voluntarily, adhering to its assertion of banking secrecy law. Eight months elapsed in the efforts to obtain the requisite disclosure by cooperative measures.

The bank regularly suggested, in the interim, a variety of alternative means by which the SEC might proceed to seek the disclosure. Some of these were doomed to failure in the opinion of the bank's own experts. It appeared to the Court that the proposals would only send the SEC on empty excursions, with little to show for them except more delay, more expense, more frustration, and possibly also, the inexorable operation of time bars against the claims by statutory limits for the assertion thereof. The proposed alternatives were not viable substitutes for direct discovery.

The matter came before the Court for crystallization on November 6, 1981 and after hearing counsel, the Court announced an informal opinion that it had determined to enter an order requiring disclosure, to be followed by severe contempt sanctions if it was not complied with. One week was fixed for submission of the order by the SEC. Apparently, the decision of the Court had a catalytic effect. A waiver of Swiss confidentiality was secured by the bank and reported to the Court. Also reported was that the bank had furnished some but not all the answers to the demanded interrogatories. A further period was requested to endeavor to complete the requisite responses with leave to show that any omissions were either not within the bank's ability to respond or were due to inappropriate demands. This moved finality forward to November 20, 1981.

Since the Court is unable to predict whether ultimate compliance will be secured or whether other notions of confidentiality may be developed on behalf of the disclosed Panamanian customers of the bank, applicable to Switzerland or elsewhere, it becomes useful to analyze the legal situation posited. The principles to be applied will be similar and will serve the further purposes of this case.

### The authorities and commentators

1. The Supreme Court's Opinion in *Societe*

Any discussion of the issue posed here must begin with the Supreme Court's opinion in *Societe Internationale Pour Participations Industrielles et Commerciales, S. A. v. Rogers*, 357 U.S. 197, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (1958) which is the Court's latest decision on the subject. *Societe* holds that the good faith of the party resisting discovery is a key factor in the decision whether to impose sanctions when foreign law prohibits the requested disclosure.

In *Societe* a Swiss holding company was suing for the return of property seized by the Alien Property Custodian during World War II. The district court dismissed plaintiff's complaint as a sanction for its refusal to comply with the Court's order to produce bank records, despite a finding that the Swiss government had constructively seized the documents[1] and that plaintiff had shown good faith efforts to comply with the production order. *Id.* at 201–02, 78 S.Ct. at 1090. The Court of Appeals affirmed.

The Supreme Court reversed. It held that where plaintiff was prohibited by Swiss law from complying with the discovery order and there was no showing of bad faith, the sanction of dismissal without prejudice was not justified. The Court indicated that a party who had made deliberate use of foreign law to evade American law might be subject to sanctions.

[T]he Government suggests that petitioner stands in the position of one who deliberately courted legal impediments to production of the Sturzenegger records, and who thus cannot now be heard to assert its good faith after this expectation was realized. Certainly these contentions, if supported by the facts, would have a vital bearing on justification for dismissal of the action, but they are not open to the Government here. The findings below reach no such conclusions. . . . *Id.* at 208–09, 78 S.Ct. at 1093–94.

Under *Societe*, then, a foreign law's prohibition of discovery is not decisive of the issue. A noncomplying party's good or bad faith is a vital factor to consider.

2. The law in this Circuit

Despite the teachings of *Societe*, three early Second Circuit cases appeared to view foreign law prohibitions as an absolute bar to ordering inspection or production of documents. *Application of Chase Manhattan Bank*, 297 F.2d 611 (2d Cir. 1962) (upholding district court's modification of subpoena duces tecum on a showing that compliance would violate Panamanian law); *Ings v. Ferguson*, 282 F.2d 149 (2d Cir. 1960) (holding that where a party served with a subpoena duces tecum was only a witness and where evidence could have been secured by letters rogatory, the subpoena had to be modified so as not to require production of documents protected by Canadian law); *First National Bank of New York v. Internal Revenue Service*, 271 F.2d 616 (2d Cir. 1959), *cert. denied* 361 U.S. 948, 80 S.Ct. 402, 4 L.Ed.2d 381 (1960) (if Panamanian law would be violated by production of records, production would not be ordered; however, such violation was not established).

All three of the above cases dealt with a nonparty witness and that factor may have been the one distinguishing these cases from *Societe*. *See, e. g., Ings v. Ferguson, supra* at 152 ("No claim is being made against either bank by any litigant. At most the bank is being called as a witness.")

---

1. The Swiss Federal Attorney "confiscated" the documents, which confiscation left possession in private hands and really amounted to a specific prohibition of the documents' release. *Id.* at 200–01, 78 S.Ct. at 1089–90.

In any event the Second Circuit has clearly moved to a more flexible position. In two later cases, both affirming decisions of this Court, the Court of Appeals adopted a balancing test approach in which a foreign law's prohibition is but one of many factors to consider.

In the first of these, *United States v. First National City Bank*, 396 F.2d 897 (2d Cir. 1968), the Court of Appeals upheld this Court's decision in *In re First National City Bank*, 285 F.Supp. 845 (S.D.N.Y.1968) holding Citibank in contempt for its failure to comply with a subpoena duces tecum in an on-going grand jury inquiry into antitrust violations that presumably had occurred in this country. The sanctions imposed by this Court were a fine of $2,000 a day until Citibank complied and a sentence of up until 60 days imprisonment on its vice-president. Citibank had resisted production of the documents claiming that compliance was forbidden by German law. This Court found that German public law did not prohibit disclosure and that moreover Citibank had not shown good faith in its attempts to comply. 285 F.Supp. at 847–48.

The Court of Appeals accepted these findings. In affirming, it emphasized that the risk or absence of foreign criminal liability did not resolve the issue. It noted first that "[a] state having jurisdiction to prescribe or enforce a rule of law is not precluded from exercising its jurisdiction *solely* because such exercise requires a person to engage in conduct subjecting him to liability under the law of another state having jurisdiction with respect to that conduct." 396 F.2d at 901, *quoting* Restatement (Second), Foreign Relations Law of the United States, § 39(1) (1965) (Restatement of Foreign Relations) (emphasis supplied by the Court of Appeals). It then balanced the interests at stake, looking for guidance to § 40 of the Restatement of Foreign Relations.[2] It looked particularly at the national interests of the United States and Germany and the hardship if any that Citibank would face in complying.

As part of its balancing, the Court of Appeals stressed that the antitrust laws "have long been considered cornerstones of this nation's economic policies, have been vigorously enforced and the subject of frequent interpretation by our Supreme Court." *Id.* at 903. It further found noteworthy that neither the United States Department of State nor the German government had expressed any view in the case. Finally, in assessing the civil liability which Citibank alleged it might suffer, the Court said:

> [Citibank] must confront the choice ... the need to "surrender to one sovereign or the other the privileges received therefrom" or, alternatively a willingness to accept the consequences. *Id.* at 905 (citation omitted).

In the second of these more recent opinions *Trade Development Bank v. Continental Insurance Co.*, 469 F.2d 35 (2d Cir. 1972), the Second Circuit affirmed this Court's decision not to order a Swiss bank to comply with defendant's request to release the names of its customers. *Trade Development Bank v. The Continental Insurance Company*, No. 71 Civ. 85 (S.D.N.Y. Oct. 10, 1972). The plaintiff was suing the defendant insurer upon a fidelity bond to recover for losses caused by the bank employee's

---

**2.** § 40 reads as follows:

§ 40. Limitations on Exercise of Enforcement Jurisdiction

Where two states have jurisdiction to prescribe and enforce rules of law and the rules they may prescribe require inconsistent conduct upon the part of a person, each state is required by international law to consider, in good faith, moderating the exercise of its enforcement jurisdiction, in the light of such factors as

(a) vital national interests of each of the states,

(b) the extent and the nature of the hardship that inconsistent enforcement actions would impose upon the person,

(c) the extent to which the required conduct is to take place in the territory of the other state,

(d) the nationality of the person, and

(e) the extent to which enforcement by action of either state can reasonably be expected to achieve compliance with the rule prescribed by that state.

falsification of customer's records in Switzerland. This Court did not pass on plaintiff's allegations concerning the prohibitions of Swiss law since it found the requested material to be unnecessary to defendant's case given that plaintiff had produced the transcripts of the accounts and other records of the bank's customers detailing the transactions. The Court of Appeals, after deciding on a *de novo* review that Swiss law did forbid the requested disclosure, deferred to this Court's discretion to deny disclosure. It again alluded to the factors set forth in § 40 of the Restatement of Foreign Relations.

> In addition to the factors that ordinarily must be considered by the court in deciding whether to order a disclosure prohibited by the law of another state (e. g. the effect on the national interests of the states affected, the nationality of the party against whom disclosure is sought, and the extent to which the court's order can expect to be enforced), the relative unimportance of the information as to the clients' identity in the present proceeding was entitled to be considered. *Id.* at 41.

Clearly then the Second Circuit has moved away from the position that a foreign law's prohibition of discovery is an absolute bar to compelling disclosure. It is worthy of note that in adopting a more flexible approach, this Circuit is squarely in line with other circuits and district courts that have considered the matter. *See, e. g., United States v. Vetco, Inc.,* 644 F.2d 1324 (9th Cir. 1981) (using § 40 of the Restatement of Foreign Relations Law and *Societe's* good faith standard in upholding sanctions for a corporation's refusal to comply with IRS summonses despite possible criminal liability under Swiss law); *State of Ohio v. Arthur Andersen & Co.,* 570 F.2d 1370, 1373 (10th Cir.), *cert. denied* 439 U.S. 833, 99 S.Ct. 114, 58 L.Ed.2d 129 (1978) (upholding the imposition of preclusionary and monetary sanctions where the resisting party had stopped claiming that foreign law forbade discovery and noting that "Andersen acted in bad faith and the balancing was heavily on Ohio's side"); *In re West-*

*inghouse Electric Corporation Uranium Contracts Litigation,* 563 F.2d 992 (10th Cir. 1977) (employing the § 40 factors and *Societe's* good faith standard to relieve the petitioner of contempt sanctions where Canadian law forbade production of documents); *In re Grand Jury Proceeding,* 532 F.2d 404 (5th Cir.), *cert. denied* 429 U.S. 940, 97 S.Ct. 354, 50 L.Ed.2d 309 (1976) (using the § 40 factors to uphold a Grand Jury subpoena served on a nonresident alien even though the very act of his testifying violated Cayman Island law); *In re Uranium Antitrust Litigation,* 480 F.Supp. 1138 (N.D.Ill.1979) (in ordering production despite Canadian nondisclosure law, the Court eschewed the § 40 balancing test and looked instead at 1) the importance of the policies underlying the antitrust laws, 2) the importance of the requested documents in illuminating key elements of the claims and 3) the degree of flexibility in the foreign nation's application of its nondisclosure laws); *American Industrial Contracting, Inc. v. Johns-Manville Corp.,* 326 F.Supp. 879 (W.D.Pa.1971) (defendants ordered to answer interrogatories in connection with an American antitrust suit despite Quebec law prohibiting disclosures, citing *Societe, supra* and *United States v. First National City Bank, supra). Cf. In the Matter of Banque Populaire,* CFTC Docket No. 80-8 (October 9, 1981) (The Commodity Futures Trading Commission barred a Swiss bank from trading on United States contract markets for 90 days for failing to provide it with information; the bank claimed it could not provide the material due to Swiss law). *See also* Meal, Governmental Compulsion as a Defense Under United States and European Community Antitrust Law, 20 Colum.J. Transnat'l L. 51, 98–101 (1981) (noting that "policy balancing has been popular with the courts as a means of resolving conflicts between foreign nondisclosure laws and discovery orders issued in United States antitrust litigation," discussing *United States v. First National City Bank, supra,* and recommending its approach to the problem of foreign compulsion of behavior violative of the antitrust laws); Note, Foreign Nondis-

closure Laws and Domestic Discovery Orders in Antitrust Litigation, 88 Yale L.J. 612, 619–20 (1979) (describing Societe's "good faith" standard and § 40's balancing test as alternative approaches, citing *United States v. First National City Bank, supra* and *In re Westinghouse Electric Corporation Uranium Contracts Litigation, supra* for the proposition that "section 40 has become very influential," and suggesting a procedure for avoiding some conflicts).[3]

*Application of the law to the Facts of this Case*

BSI claims that it may be subject to criminal liability under Swiss penal and banking law if it discloses the requested information. However, this Court finds the factors in § 40 of the Restatement of Foreign Relations to tip decisively in favor of the SEC. Moreover, it holds BSI to be "in the position of one who deliberately courted legal impediments . . . and who thus cannot now be heard to assert its good faith after this expectation was realized." *Societe, supra* at 208–09, 78 S.Ct. at 1093–94. BSI acted in bad faith. It made deliberate use of Swiss nondisclosure law to evade in a commercial transaction for profit to it, the strictures of American securities law against insider trading. Whether acting solely as an agent or also as a principal (something which can only be clarified through disclosure of the requested information), BSI invaded American securities markets and profited in some measure thereby.[4] It cannot rely on Swiss nondisclosure law to shield this activity.

**1. The vital national interests at stake**

The first of the § 40 factors is the vital national interest of each of the States. The strength of the United States interest in enforcing its securities laws to ensure the integrity of its financial markets cannot seriously be doubted. That interest is being continually thwarted by the use of foreign bank accounts. Congress, in enacting legislation on bank record-keeping, expressed its concern over the problem over a decade ago:

> Secret foreign bank accounts and secret foreign financial institutions have permitted a proliferation of "white collar" crime . . . [and] have allowed Americans and others to avoid the law and regulations concerning securities and exchanges . . . . The debilitating effects of the use of these secret institutions on Americans and the American economy are vast.

H.R.Rep.No. 975, 91 Cong., 2d Sess. 12, *reprinted in* [1970] U.S.Code Cong. & Admin.News 4394, 4397.

The evisceration of the United States interest in enforcing its securities laws continues up to the present. *See, e. g.*, Wall Street Journal, Oct. 29, 1981, at 1, col. 5 ("some Wall Street sources believe the SEC faces an insurmountable problem: obtaining from foreign sources the information that often is necessary to identify violators").

The Swiss government, on the other hand, though made expressly aware of the litigation, has expressed no opposition. In

---

**3.** One way in which the Second Circuit has not moved in line with other courts has been its failure thus far to distinguish the analysis used for deciding to issue an order compelling discovery and that for imposing sanctions. *Compare United States v. First National City Bank, supra* (a sanctions case) with *Trade Development Bank v. Continental Insurance Co., supra* (involving an order only). This failure to distinguish has been criticized by courts which have found the effect of foreign law, and a party's good or bad faith, relevant only to the decision whether to impose sanctions, *State of Ohio v. Arthur Andersen & Co., supra,* at 1372; *Arthur Andersen & Co. v. Finesilver,* 546 F.2d 338, 341 (10th Cir. 1976), *cert. denied,* 429 U.S. 1096, 97 S.Ct. 1113, 51 L.Ed.2d 543 (1977). Such a distinction in analysis makes little, if

any, practical difference. This problem need no longer be considered herein, perhaps, because the principals have finally furnished waivers of Swiss banking confidentiality herein.

**4.** BSI's contention that it is only a "nominal" party and therefore that it is wrong to place it in the predicament of having conflicting legal obligations is further answered by the well-established rule of agency law that an agent is liable as principal for the acts of an undisclosed principal. *See, e. g., Bottorff v. Ault,* 374 F.2d 832 (7th Cir. 1967); *Siegel v. Council of Long Island Educators, Inc.,* 75 Misc.2d 750, 348 N.Y. S.2d 816 (Sup.Ct.1973) (per curiam).

response to BSI's lawyers inquiries, the incumbent Swiss Federal Attorney General, Rudolf Gerber, said only that a foreign court could not change the rule that disclosure required the consent of the one who imparted the secret and that BSI might thus be subject to prosecution. The Swiss government did not "confiscate" the Bank records to prevent violations of its law, as it did in *Societe.* NEITHER THE UNITED STATES NOR THE SWISS GOVERNMENT has suggested that discovery be halted. Rather, the Assistant Legal Adviser for Economic and Business Affairs for the Department of State explicitly has said in an affidavit that:

> I am aware of the efforts of the plaintiff Securities and Exchange Commission ("Commission") to obtain through civil discovery in the United States details of the transactions underlying this litigation and the identities and other information concerning persons having an interest in these transactions from defendant Banca Della Svizzera Italiana. State Department officials have explored the possibility of alternative methods for obtaining this information both in discussions with other U.S. officials and with Swiss officials and legal experts. On the basis of my knowledge and understanding of this case and of the foreign policy and regulatory interests of the United States and Switzerland involved, the Department of State does not object to the efforts of the Commission to obtain this information through civil discovery under the exclusive jurisdiction of this court.

(Still aff. Exhibit 7, Affidavit of John R. Crook).

The Court of Appeals in *United States v. First National City Bank, supra,* found the fact that the governments concerned had not intervened of great importance. It observed that "when foreign governments, including Germany, have considered their vital national interests threatened, they have not hesitated to make known their objections ... to the issuing court." *Id.* at 904.

It is also of significance that the secrecy privilege, as even BSI's expert admits (*see* Straub Aff. Exhibit M, letter of Maurice

Aubert) is one belonging to the bank customers and may be waived by them. It is not something required to protect the Swiss government itself or some other public interest. *See also Trade Development Bank v. Continental Insurance Co., supra* at 41, n.3 ("[s]ince the Swiss bank secrecy law was enacted primarily to protect the right of privacy of clients, the client is 'master of the secret' ") (citations omitted).

2. Hardship considerations and the element of good faith

The second factor of § 40 of the Restatement of Foreign Relations is the extent and nature of the hardship that inconsistent enforcement actions would impose upon the party subject to both jurisdictions. It is true that BSI may be subject to fines and its officers to imprisonment under Swiss law. However, this Court notes that there is some flexibility in the application of that law. Not only may the particular bank involved obtain waivers from its customers to avoid prosecution, but Article 34 of the Swiss Penal Code contains a "State of Necessity" exception that relieves a person of criminal liability for acts committed to protect one's own good, including one's fortune, from an immediate danger if one is not responsible for the danger and one cannot be expected to give up one's good. (Still Aff. Exhibit 8, Opinion of Dr. Hans Walder, Professor of the Institute of Criminal Law, University of Bern and former Attorney General of Switzerland).

Of course, given BSI's active part in the insider trading transactions alleged here, the Swiss government might well conclude—as this Court has—that BSI is responsible for the conflict it is in and that therefore the "State of Necessity" exception should not apply. However, that is certainly no cause for this Court to withhold its sanctions since the dilemma would be a result of BSI's bad faith. A party's good or bad faith is an important factor to consider, and this Court finds that BSI, which deposited the proceeds of these transactions in an American bank account in its name and which certainly profited in some

measure from the challenged activity, undertook such transactions fully expecting to use foreign law to shield it from the reach of our laws. Such "deliberate courting" of foreign legal impediments will not be countenanced.

### 3. The remaining § 40 factors

The last three of the § 40 Restatement of Foreign Relations Law factors—the place of performance, the nationality of the resisting party, and the extent to which enforcement can be expected to achieve compliance with the rule prescribed by that state—appear to be less important in this Circuit. It is significant nevertheless that they too tip in favor of the SEC. Performance may be said to occur here as well as in Switzerland since the actual answering of the interrogatories will presumably take place in the United States, where BSI's lawyers are. As for citizenship, it is true that BSI is a Swiss corporation. However, its transnational character, as evidenced by its large number of foreign affiliates, (Still Aff. Exhibit 9, 1979 Annual Report of BSI) and its New York "subsidiary" (so styled by it), render this Court less reluctant to order BSI to conform to our laws even where such an order may cause conflict with Swiss law. Last, with respect to enforcement, this Court believes that an appropriate formal order directing the demanded disclosure, to the extent that compliance has been incomplete, will serve as the requisite foundation for any further actions that may be needed in the form of sanctions and should serve to bring home the obligations a foreign entity undertakes when it conducts business on the American securities exchanges.

### Conclusion

It would be a travesty of justice to permit a foreign company to invade American markets, violate American laws if they were indeed violated, withdraw profits and resist accountability for itself and its principals for the illegality by claiming their anonymity under foreign law.

There presently are sufficient indications that a waiver of confidentiality finally has unlocked the Swiss barrier heretofore asserted by BSI to disclosure. However, the SEC urges that the responses are partial only and that full compliance with demands for information is yet to be made. Consequently, to give BSI the opportunity to comply or show that it has complied to the extent of its ability or to furnish a proper indication that the remaining demands should be modified, a final order to be entered hereon will be withheld for a further period until November 20, 1981. Meantime this decision shall constitute an order that BSI is directed to complete its answers to all of the demands in the SEC's First Interrogatories, pertaining to St. Joe.

SO ORDERED.