**MINPECO, S.A., Plaintiff,**

**v.**

**CONTICOMMODITY SERVICES, INC., Conticapital Management, Inc., Conticapital Limited, Norton Waltuch, Nelson Bunker Hunt, Lamar Hunt, William Herbert Hunt, International Metals Investment Co., Ltd., Sheik Mohammed Aboud Al-Amoudi, Sheik Ali Bin Mussalem, Naji Robert Nahas, Gilion Financial, Inc., Acli International Commodity Services, Inc., Banque Populaire Suisse, Advicorp Advisory and Financial Corporation, S.A., Mahmoud Fustok, Merrill Lynch, Pierce, Fenner & Smith, Inc., Bache Halsey Stuart Shields, Inc., E.F. Hutton & Company, Inc., Commodity Exchange Inc., the Board of Trade of the City of Chicago, Continental Grain Company, and Walter Goldschmidt, Defendants.**

**Ronald GORDON, Plaintiff,**

**v.**

**Nelson Bunker HUNT, William Herbert Hunt, Lamar Hunt, International Metals Investment Co., Ltd., Sheik Mohammed Aboud Al-Amoudi, Sheik Ali Bin Mussalem, Faisal Ben Abdullah Al Saoud, Mahmoud Fustok, Naji Robert Nahas, Bache Halsey Stuart Shields, Inc., Bache Group, Inc., Merrill Lynch, Pierce, Fenner & Smith, Inc., Conti-Commodity Services, Inc., Conti-Capital Management, Inc., Conti-Capital Ltd., Norton Waltuch, Melvin Schnell, Gilion Financial, Inc., Banque Populaire Suisse, Advicorp Advisory and Financial Corporation, S.A., Commodity Exchange, Inc., the Board of Trade of the City of Chicago, Acli International Commodity Services, Inc., Litardex Traders, S.A., and John Does Nos. 1 Through 15, Defendants.**

**Philip and Dorothy KORWEK, Mary Finkelstein, William L. Cohn and James G. Williams, Plaintiffs,**

**v.**

**Nelson Bunker HUNT, William Herbert Hunt, Lamar Hunt, International Metals Investment Co., Ltd., Sheik Moham-**

518

met Aboud Al-Amoudi, Sheik Ali Bin Mussalem, Faisal Ben Abdullah Al Saoud, Mahmoud Fustok, Naji Robert Nahas, Bache Halsey Stuart Shields, Inc., Bache Group, Inc. (Prudential Bache Securities, Inc.), Merrill Lynch, Pierce, Fenner & Smith, Inc., Conti-Commodity Services, Inc., Conti-Capital Management, Inc., Conti-Capital Ltd., Norton Waltuch, Melvin Schnell, Gilion Financial, Inc., Banque Populaire Suisse, Advicorp Advisory and Financial Corporation, S.A., Commodity Exchange, Inc., the Board of Trade of the City of Chicago, Donaldson, Lufkin & Jenrette, Acli Futures, Inc., formerly, Acli International Commodity Services, Inc., Litardex Traders, S.A., Walter Goldschmidt, Continental Grain Co., Defendants.

Nos. 81 Civ. 7619 (MEL), 82 Civ. 1318 (MEL) and 84 Civ. 7934 (MEL).

United States District Court, S.D. New York.

July 9, 1987.

Cole & Corette, Washington, D.C. (Mark A. Cymrot, Thomas O. Gorman, Michele C. Bartoli, of counsel), Grand & Ostrow, New York City, for plaintiff Minpeco, S.A.

Deutsch & Frey, New York City (Herbert I. Deutsch, of counsel), for the Gordon and Korwek plaintiff classes.

Arnold & Porter, Washington, D.C. (Lawrence V. Stein, of counsel), Gilbert, Segall and Young, New York City (Richard B. Schaeffer, of counsel), for defendant Banque Populaire Suisse.

LASKER, District Judge.

Plaintiffs in three related cases move pursuant to Fed.R.Civ.P. 37 for an order compelling the production of documents and answers to interrogatories by Banque Populaire Suisse ("BPS"), a defendant in all three actions. At issue is BPS' refusal to provide certain documents and interrogatory answers containing information whose disclosure BPS contends would violate Swiss bank secrecy laws.

The lawsuits arise out of the events in the silver market during 1979 and early 1980 when the price of silver rose dramatically in a period of several months before collapsing. The plaintiff in *Minpeco, S.A. v. Conticommodity Services, Inc.*, No. 81–7619 (MEL), is a minerals trader wholly owned by the government of Peru which held positions in silver futures during this volatile period. *Gordon v. Hunt*, No. 82–1318 (MEL), and *Korwek v. Hunt*, No. 84–7934 (MEL), are class actions brought by short sellers of silver futures contracts who traded during various times between July 1979 and February 1980. Plaintiffs in all three actions allege that a number of individual and firm defendants, including BPS, attempted to manipulate the price of silver and silver futures and conspired to monopolize the market for silver and silver futures with the result that the price of silver climbed to artificially high levels and plaintiffs suffered substantial losses when they liquidated their positions. The defendants are charged with, *inter alia,* violations of federal and state antitrust laws, federal commodities fraud, and violations of the federal racketeering statute. Discovery in the three cases has proceeded on a consolidated basis.

During the pendency of plaintiffs' motion to compel, BPS settled with plaintiffs in all three actions. *See* Settlement Agreement (Apr. 1, 1987) (*Gordon & Korwek*); Stipulation of Dismissal With Prejudice (June 23, 1987) (*Minpeco*). 116 F.R.D. 313. None of the settlement agreements provides for a resolution of the instant motion, and plaintiffs continue to press their need for evidence that they claim may strengthen or prove their case against the remaining defendants.

## I.

### A.

According to plaintiffs, the documents and information withheld pertain generally to the customers of BPS who traded in large omnibus accounts maintained in BPS' name through various brokers who are defendants in these actions. Based on the discovery already conducted, plaintiffs contend that BPS participated in the formation in 1978 of an entity known as Advicorp Advisory and Financial Corporation, S.A. ("Advicorp"), whose major shareholders included BPS and Naji Nahas. Advicorp's silver trading clients included Nahas, Mahmoud Fustok, and Crown Prince Abdullah bin Abdul Aziz al Saud. Plaintiffs claim that each Advicorp client opened an account at BPS, that trading in these accounts was directed by Advicorp under a power of attorney from BPS to various brokers including ACLI International Commodity Services, Inc., ContiCommodity Services Inc., and Merrill Lynch Pierce Fenner & Smith, Inc., that BPS required immediate confirmation by the broker to it of all trades, and that BPS closely monitored Advicorp by placing one of its officers on Advicorp's board of directors. BPS account statements, plaintiffs claim, reveal that during 1979–80 Advicorp purchased enormous long positions in silver futures through its omnibus accounts at these brokerage houses.

Plaintiffs also state, based on discovery obtained thus far, that meetings in France in August 1979 involving Nahas, Fustok, Nelson Bunker Hunt, and representatives of Advicorp and in October 1979 involving Nahas, Hunt, Norton Waltuch (a key employee of ContiCommodity Services, Inc.), and a representative of Advicorp establish an interrelationship between parties owning or controlling large silver futures positions during the relevant period. In this regard plaintiffs point out the existence of a loss-sharing agreement, executed by BPS

in April 1980, which if signed by the other parties would have required the Hunt brothers, Fustok, and Nahas to bear 50 per cent of BPS' estimated $70 million in losses resulting from the crash of the silver market.

Plaintiffs call attention to the fact that BPS responded to 27 out of 47 interrogatories and 68 of 70 document requests, at least in part, by asserting a claim of privilege under Swiss bank secrecy law. Plaintiffs also note that they cannot determine how many documents have been withheld because BPS has refused to identify those documents withheld on secrecy grounds and that in some instances redactions have rendered the documents released meaningless. Finally, plaintiffs contend that their inability to procure important documentary evidence has severely hampered their depositions of BPS witnesses.

### B.

BPS responds that it has produced over 18,000 documents pursuant to plaintiffs' requests, answered three sets of interrogatories, and made twelve BPS witnesses available for 48 deposition days. BPS stresses that it has not invoked Swiss bank secrecy to withhold any information about its own conduct, including all of its own positions in silver or silver futures or the relationship of Advicorp to BPS.

BPS points out that waivers of Swiss bank secrecy rights have been obtained from the Hunts, Fustok, Advicorp, and International Metals Investment Co., Ltd., and that BPS has therefore been able to provide full discovery with respect to these defendants. The only defendant from whom a waiver has been sought in this connection and who has not waived is Nahas. In this regard BPS emphasizes that as part of Nahas' settlement with the Commodities Futures Trading Commission ("CFTC"), see In the Matter of Nelson B. Hunt, et al. v. CFTC, Docket No. 85–12, Nahas has waived his foreign secrecy rights as to the CFTC and has agreed to produce documents to the CFTC relating to his involvement in the silver market in 1979–80—documents which the CFTC has produced to plaintiffs pursuant to an outstanding subpoena.

As to customers of BPS who are not defendants in these actions, BPS claims that it has repeatedly sought to obtain waivers of bank secrecy rights with little success. BPS maintains that it has relied on the bank secrecy privilege only to withhold information relating to customers who have not executed waivers.

### II.

It is not disputed that a district court "has the *power* to impose discovery under the Federal Rules of Civil procedure when it has personal jurisdiction over the foreign party." *Societe Nationale Industrielle Aerospatiale v. United States District Court,* —— U.S. ——, —— n. 4, 107 S.Ct. 2542, 2546 n. 4, 96 L.Ed.2d 461 (1987) (Blackmun, J., concurring in part and dissenting in part) (citing *Societe Internationale Pour Participations Industrielles et Commerciales, S.A. v. Rogers,* 357 U.S. 197, 204–06, 78 S.Ct. 1087, 1091–93, 2 L.Ed.2d 1255 (1958)) (emphasis in original). Moreover, in *Societe Internationale* the Supreme Court specifically held that the interdictions of the Swiss bank secrecy law do not bar a conclusion that a foreign entity has "control" over documents within the meaning of Fed.R.Civ.P. 34. *Id.* Since there is no question in this case that the court has personal jurisdiction over BPS and no dispute over BPS' control over the documents and information plaintiffs seek, it follows that the court has the power under Rule 37(b)(2) to issue the order to compel requested by plaintiffs.

The critical question is whether the court should, as a matter of discretion, issue such an order in view of the Swiss secrecy objections raised by BPS. Before this question can be answered, however, two points must be made regarding the boundaries of the court's discretion.

### A.

■ BPS argues that the law in the Second Circuit, as reflected in three cases de-

cided by the Court of Appeals in the years immediately following the Supreme Court's decision in *Societe Internationale,* is that foreign law prohibitions on disclosure act as a bar to ordering the production of documents. *See Application of Chase Manhattan Bank,* 297 F.2d 611, 612–13 (2d Cir.1962); *Ings v. Ferguson,* 282 F.2d 149, 152–53 (2d Cir.1960); *First Nat'l City Bank v. IRS,* 271 F.2d 616, 619 (2d Cir. 1959), *cert. denied,* 361 U.S. 948, 80 S.Ct. 402, 4 L.Ed.2d 381 (1960). Even if this were the law of the circuit at one time, the Court of Appeals has in more recent cases moved to a more flexible position. For example, in *United States v. First National City Bank,* 396 F.2d 897 (2d Cir.1968), the Court of Appeals quoted with approval the principle set out in the Restatement (Second) of the Foreign Relations Law of the United States § 39(1) (1965):

> A state having jurisdiction to prescribe or to enforce a rule of law is not precluded from exercising its jurisdiction *solely* because such exercise requires a person to engage in conduct subjecting him to liability under the law of another state having jurisdiction with respect to that conduct.

*Id.* at 901 (emphasis added by Court of Appeals). The Court went on to state: "Mechanical or overbroad rules of thumb are of little value; what is required is a careful balancing of the interests involved and a precise understanding of the facts and circumstances of the particular case." *Id.* In *Trade Development Bank v. Continental Insurance Co.,* 469 F.2d 35 (2d Cir. 1972), the Court of Appeals found that Judge Pollack had not abused his discretion in not ordering a Swiss bank to identify customer accounts in violation of Swiss bank secrecy law but stated that the district court might appropriately have exercised its power to do so. *Id.* at 41. Other courts which have considered this question agree that the Second Circuit Court of Appeals has, in line with other circuits, now adopted a more flexible approach than that reflected in the early cases. *See SEC v. Banca Della Svizzera Italiana,* 92 F.R.D. 111, 114–17 (S.D.N.Y.1981); *Compagnie Francaise D'Assurance Pour Le Commerce Exterieur v. Phillips Petroleum Co.,* 105 F.R.D. 16, 29 (S.D.N.Y.1984); *United States v. Vetco Inc.,* 691 F.2d 1281, 1288 n. 8 (9th Cir.), *cert. denied,* 454 U.S. 1098, 102 S.Ct. 671, 70 L.Ed.2d 639 (1981).

### B.

[2] Focusing on the other boundary of a court's discretion in this context, plaintiffs have argued that a court need not consider the effect of foreign law in deciding whether to issue an order compelling discovery. Citing the case of *Arthur Andersen & Co. v. Finesilver,* 546 F.2d 338, 341–42 (10th Cir.1976), *cert. denied,* 429 U.S. 1096, 97 S.Ct. 1113, 51 L.Ed.2d 543 (1977), plaintiffs contend that consideration of foreign law becomes appropriate only in determining whether to impose sanctions for noncompliance with discovery already ordered. In plaintiffs' view, the court need only determine that it has jurisdiction over the party from whom the discovery is sought and that the information requested is relevant. The short answer to plaintiffs' argument is that the Second Circuit Court of Appeals has not adopted the approach of distinguishing the analysis appropriate for deciding to issue an order compelling discovery from that for imposing sanctions for noncompliance. The Court of Appeals in the more recent cases has consistently considered foreign law implications in reviewing both orders to compel and orders imposing sanctions. *See, e.g., Trade Development Bank,* 469 F.2d at 39–42 (refusal to issue order to compel); *First National City Bank,* 396 F.2d at 900–05 (imposition of civil contempt sanctions); *see also, e.g., United States v. Davis,* 767 F.2d 1025, 1033–36 (2d Cir.1985) (issuance of order compelling bank customer's consent to disclosure). Other courts which have considered the matter agree that in the Second Circuit foreign law is to be considered at the order stage. *See Banca Della Svizzera,* 92 F.R.D. at 117 n. 3; *Remington Products, Inc. v. N. Am. Philips Corp.,* 107 F.R.D. 642, 648 n. 4 (D.Conn.1985) (appendix).

### III.

In deciding motions such as this, the court of appeals for this circuit, along with other circuit and district courts, "has used an analysis derived from Section 40 of the Restatement (Second) of the Foreign Relations Law of the United States (1965) in evaluating the propriety of an [order] directing the production of information or documents located abroad where such production would violate the law of the state in which the documents are located." *United States v. Davis,* 767 F.2d at 1033–34 (citing subpoena cases); *see also Trade Development Bank,* 469 F.2d at 41; *First National City Bank,* 396 F.2d at 902. Section 40 provides:

### Limitations on Exercise of Enforcement Jurisdiction

Where two states have jurisdiction to prescribe and enforce rules of law and the rules they may prescribe require inconsistent conduct upon the part of a person, each state is required by international law to consider, in good faith, moderating the exercise of its enforcement jurisdiction, in the light of such factors as

(a) vital national interests of each of the states,

(b) the extent and the nature of the hardship that inconsistent enforcement actions would impose upon the person,

(c) the extent to which the required conduct is to take place in the territory of the other state,

(d) the nationality of the person, and

(e) the extent to which enforcement by action of either state can reasonably be expected to achieve compliance with the rule prescribed by that state.

Courts in this circuit have characterized the first two factors—the competing interests of the countries involved and the hardship imposed by compliance—as far more important in the balancing test than the last three, *see Banca Della Svizzera,* 92 F.R.D. at 119; *Remington Products,* 107 F.R.D. at 652; *Garpeg, Ltd. v. United States,* 583 F.Supp. 789, 795 (S.D.N.Y.1984), and a

reading of the pertinent Second Circuit cases bears this out, *see First National City Bank,* 396 F.2d at 897 ("[T]he obvious, albeit troublesome, requirement for us is to balance the national interests of the United States and Germany and to give appropriate weight to the hardship, if any, Citibank will suffer.")

At least two other factors have been found to be significant in addition to those mentioned above. The first is the importance of the information and documents requested to the conduct of the litigation. *See Trade Development Bank,* 469 F.2d at 41 ("relative unimportance of the information ... in the present proceeding was entitled to be considered"); *In Re Uranium Antitrust Litigation,* 480 F.Supp. 1138, 1146, 1154–55 (N.D.Ill.1979) ("normal discovery standard of whether a document is relevant or is calculated to lead to the discovery of admissible evidence ... should be replaced by the higher standard of whether the requested documents are crucial to the resolution of a key issue in the litigation"); *Vetco,* 691 F.2d at 1290 ("no showing that the documents are cumulative of records already produced"); *but see Compagnie Francaise,* 105 F.R.D. at 32 n. 8 (declining to consider the importance of the requested documents to the requesting party's case).

The second additional factor is the good or bad faith of the party resisting discovery. This factor was first articulated in *Societe Internationale,* in which the Supreme Court considered a Swiss company's good faith efforts to comply with a production order in determining whether the imposition of the sanction of dismissal was appropriate. 357 U.S. at 208–13, 78 S.Ct. at 1093–96. Courts in this circuit have considered a resisting party's good faith efforts to comply with discovery at the order stage as well as the sanctions stage. *See, e.g., First National City Bank,* 396 F.2d at 900 & n. 8, 905 (sanctions stage); *Compagnie Francaise,* 105 F.R.D. at 31–32 (order stage). Another aspect of a resisting party's good faith which is scrutinized by courts in this area is whether a party's

inability to produce documents as a result of foreign law prohibitions was fostered by its own conduct prior to the commencement of the litigation. Although this aspect of good faith did not figure prominently in *Societe Internationale,* the Supreme Court stated there that a party's having "deliberately courted legal impediments to production ..., if supported by the facts, would have a vital bearing" on its ruling. 357 U.S. at 208–09, 78 S.Ct. at 1093–94; *see also Banca Della Svizzera,* 92 F.R.D. at 117–19 (applying pre-litigation conduct good faith factor at order stage).

To sum up: the principal factors to consider in deciding this motion to compel are (1) the competing interests of the nations whose laws are in conflict, (2) the hardship of compliance on the party or witness from whom discovery is sought, (3) the importance to the litigation of the information and documents requested, and (4) the good faith of the party resisting discovery.

IV.

A.

■ The United States has a strong national interest in enforcing its antitrust and commodities fraud laws, *cf. Davis,* 767 F.2d at 1035 (criminal context) (citing cases), to ensure the integrity of its financial markets, *see Banca Della Svizzera,* 92 F.R.D. at 117. The strength of the congressional policies behind the antitrust and commodities laws is not open to question, and the complaints in these cases charge defendants with activities which if proven would amount to massive violations of this nation's most fundamental economic regulatory statutes. Indeed, the United States government's concern with the events which lie at the heart of these cases is demonstrated by the extensive investigations conducted by both the CFTC and more than one congressional committee. *See, e.g.,* Silver Prices and the Adequacy of Federal Actions in the Marketplace, 1979–80: Hearings Before the Subcomm. on Commerce, Consumer, and Monetary Affairs of the House Comm. on Government Operations, 96th Cong., 2d Sess.; Report of

the Commodities Futures Trading Commission on Recent Developments in the Silver Futures Markets, Senate Comm. on Agriculture, Nutrition and Forestry, 96th Cong., 2d Sess. (Comm. Print 1980); *see also In the Matter of Nelson B. Hunt, et al., v. CFTC,* Dkt. No. 85–12 (administrative complaint filed Feb. 28, 1985).

It is of some significance that the cases involved here are private civil actions rather than criminal or civil enforcement proceedings in which the United States government is the party moving to compel. Were this a criminal or administrative action, this court could "accord some deference to the determination of the Executive Branch—the arm of the government charged with primary responsibility for formulating and effectuating foreign policy— that the adverse diplomatic consequences of the discovery request would be outweighed by the benefits of disclosure." *Davis,* 767 F.2d at 1035; *see also First National City Bank,* 396 F.2d at 904; *Vetco,* 691 F.2d at 1289 n. 9. Nevertheless, it is fair to say that the United States government, which has expressed no opinion on the present motion, is well aware of the discovery sought and taken in these cases. *See Minpeco, S.A. v. ContiCommodity Services, Inc.,* 653 F.Supp. 957 (S.D.N.Y. 1987) (motion by CFTC to enforce subpoena calling for production of discovery material generated in *Minpeco, Gordon,* and *Korwek* cases). Moreover, although the interest of the United States in criminal and civil enforcement suits is normally stronger than its interest in private disputes, the formal posture of these cases is less significant in that the plaintiffs here are asserting private rights of action under the antitrust, commodities, and racketeering statutes that have the effect—intended by Congress, *see* Clayton Act § 4, 15 U.S.C. § 15 (antitrust); Commodity Exchange Act § 22, 7 U.S.C. § 25 (commodities fraud); Racketeer Influenced and Corrupt Organizations Act § 901(a), 18 U.S.C. § 1964(c) (racketeering)—of enforcing the law by means of "private attorney generals." In fact, it is difficult to imagine a private commercial

lawsuit which could be more infused with the public interest. Finally, it should also be noted that the United States has a substantial interest in fully and fairly adjudicating matters before its courts. *Compagnie Francaise*, 105 F.R.D. at 30.

The Swiss national interest in this matter is embodied in that country's bank secrecy statutes. Based on the affidavits of BPS' legal experts (which are not controverted by plaintiffs' experts as to the pertinent provisions), it can be said that Article 47 of the Swiss Banking Act imposes penal sanctions on officers, directors, employees or agents of a bank who disclose a customer's identity or any other information about a customer obtained in the context of the banking relationship. Intentional violations are punished by imprisonment of up to six months or by a fine of up to 50,000 Swiss francs, which can be imposed together. Article 47 protects the commercial privacy interests of any bank customer, whether or not he is a Swiss citizen or resident, and prosecutions under the law may be initiated both by the public prosecutor and by the aggrieved customers themselves. Consent by a customer to disclosure relieves a bank of its secrecy obligation under Article 47. It is conceded by both sides that much of the information plaintiffs seek on this motion would be covered by Article 47.

According to BPS' experts, disclosure of customer account information would also expose a bank to a variety of administrative sanctions that could be imposed by the Swiss Banking Commission, including revocation of the bank's authority to conduct business in the case of a serious violation. In addition, Article 273 of the Swiss Penal Code makes it a crime for anyone to provide secret business information to a private or official foreign organization, and banking information is considered a business secret within the meaning of the law. To similar effect is Article 162 of the Swiss Penal Code, which prohibits the disclosure of a commercial secrets. Violations of Article 273 are punishable by up to 20 years imprisonment, although plaintiffs' expert indicates that the statute is applied only in the more serious cases, in which it appears that Swiss national interests are actually endangered, and is rarely the basis for a criminal prosecution. Finally, disclosure of customer confidences would expose a bank to civil tort suits as authorized generally under Article 28 of the Swiss Civil Code and Articles 41 and 49 of the Swiss Code of Obligations.

There are several indications that the Swiss interest in bank secrecy is substantial. First, the prohibition on disclosure of customer information is specifically expressed in at least one criminal statute that would apply to the disclosure of documents and information sought on this motion. In contrast to the situation presented here, courts in this circuit have considered the foreign nation's interest in prohibiting disclosure weaker where bank secrecy doctrine is embodied in a non-statutory "privilege" whose "enforcement [is left] to the vagaries of private litigation" and where the consequence of disclosure is at most civil liability. *First National City Bank*, 396 F.2d at 903 (German bank secrecy); *see also United States v. Chase Manhattan Bank, N.A.*, 584 F.Supp. 1080, 1086 (S.D.N.Y.1984) (Hong Kong bank secrecy); *Garpeg*, 583 F.Supp. at 796 (same).

Second, the bank secrecy laws involved here have the legitimate purpose of protecting commercial privacy inside and outside Switzerland. In this respect, Article 47 is to be distinguished from a number of other foreign anti-disclosure laws whose purposes courts have determined do not warrant deference. *See, e.g., Compagnie Francaise*, 105 F.R.D. at 30 (French "blocking statute" designed solely to protect French business from foreign discovery); *Remington Products*, 107 F.R.D. at 651 (Dutch "blocking statute" designed to frustrate discovery in U.S. antitrust cases); *In re Uranium Antitrust*, 480 F.Supp. at 1143 (Canadian, Australian, and South African statutes enacted for express purpose of impairing jurisdiction of U.S. courts over activities of uranium cartel) (explicitly declining to consider foreign national interest).

Third, the Swiss government has submitted to the court two official statements in this case which express its general position as to the importance of Swiss banking secrecy laws to the interests of Switzerland, the constraints under Article 47 that confront BPS in light of the discovery requests it has received, and the Swiss government's objection to any action in this case that would lead to a violation of Article 47. As distinguished from the situation here, the Second Circuit Court of Appeals has twice indicated that a foreign government's failure to express a view in such a context militates against a finding that strong national interests of the foreign country are at stake. *See Davis,* 767 F.2d at 1035 ("The absence of any objection by the Cayman government to the subpoena and subsequent order ... is significant."); *First National City Bank,* 396 F.2d at 904 ("[W]hen foreign governments ... have considered their vital national interests threatened, they have not hesitated to make known their objections...."); *see also Banca Della Svizzera,* 92 F.R.D. at 111 ("The Swiss government, ... though made expressly aware of the litigation, has expressed no opposition."). Although the statements of the Swiss government stop short of declaring that the issuance of an order to compel in this case would require BPS to violate Swiss law or would embarrass Swiss-American relations, they do evince a strong Swiss interest in bank secrecy and a familiarity with this litigation.

On the other hand, two considerations cut against the Swiss national interest at stake in this proceeding. First, although the bank secrecy privilege is codified in the Swiss criminal law, it differs from the traditional criminal proscription in that it remains a personal privilege that can be waived by the bank customer. In this sense, then, Swiss bank secrecy law primarily protects the right of commercial privacy of bank clients, not the Swiss government itself or some other public institution or interest. *Banca Della Svizzera,* 92 F.R.D. at 118 (citing *Trade Development Bank,* 469 F.2d at 41 n. 3).

Second, it is arguable that since BPS, as a participant in futures trading on United States markets, can be required under the Commodity Exchange Act and CFTC regulations to report such information as the identity of its customers holding positions in silver bullion futures on U.S. contract markets in its accounts and the size of those positions, *see In the Matter of Banque Populaire Suisse,* [1980–82 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 21,255 at 25,250 & 25,256 (CFTC Oct. 9, 1981), Swiss "national interests are not impinged upon to the extent that the [requested] records contain information which [BPS] was required to disclose under American law," *Davis,* 767 F.2d at 1035. In *Banque Populaire Suisse,* the CFTC ruled that BPS should have required its brokerage customers to execute waivers of their bank secrecy rights as a condition to trading on U.S. markets. While it is true, as BPS argues, that the information which might have been disclosed to the CFTC pursuant to such customer waivers would not necessarily be coextensive with the wide scope of information sought by plaintiffs in these cases, the principle stated by the Court of Appeals in the *Davis* case is still instructive. In the matter of comity analysis, the extent to which court-ordered discovery is perceived to infringe upon foreign interests is not an "all or nothing" proposition.

**B.**

The second important factor to consider is the potential hardship which would be imposed on BPS by an order compelling the requested discovery. The experts for both sides agree that much of the information sought by plaintiffs is prohibited from disclosure by Article 47 of the Swiss Penal Code and that it is this provision of Swiss law which would apply as the basis for a prosecution if BPS were to provide customer information without consent. (In fact, the Swiss government mentioned only Article 47 in its official statements submitted to the court.) The penalties which can be imposed on BPS employees who are found to have violated Article 47 include a substantial fine (up to well over $30,000 at

current exchange rates) and a six-month incarceration. Although neither side has provided helpful information regarding frequency of enforcement and punishments imposed under Article 47, plaintiffs do not argue that BPS and its employees face no real threat of prosecution under the statute. *Compare Compagnie Francaise*, 105 F.R.D. at 30 (French blocking statute never intended to be and not expected to be enforced against French subjects). Moreover, even if it were feasible—which BPS' expert doubts—to secure waivers of prosecution from the Swiss authorities, BPS could not insulate itself from criminal prosecution because private parties can themselves initiate criminal actions under the Swiss legal system. Finally, although perhaps less severe than criminal sanctions under Article 47, administrative sanctions and civil liability can also result from BPS disclosure of customer information.

In examining the hardship on the party from whom compliance is sought, courts also look at the likelihood that enforcement of foreign law will be successful. *See, e.g., Davis*, 767 F.2d at 1035 (Cayman secrecy law found to have many exceptions); *First National City Bank*, 396 F.2d at 900 n. 6, 905 ("Citibank appears to have a number of valid defenses if it is sued"). Plaintiffs argue in this regard that there exist two related doctrines in Swiss law which BPS could assert as defenses in the event it is prosecuted for complying with court-ordered discovery: "state of necessity" and "justifying facts." Both defenses appear to be based on the idea that if the consequence of not violating the law is severe enough, the violation is deemed coerced (or an act of self defense) and is therefore excused. Essential to such a defense is that the threatened loss to the violator exceeds the injury to the victim of the violation. A close reading of the affidavits submitted by plaintiffs' experts, however, indicates that not even plaintiffs' experts would predict the success of these defenses in the circumstances of these cases. One of the experts states that not only do Swiss case law and commentaries take a restrictive view of such defenses generally but

the applicability of the defenses would be even less likely where BPS was involved in a civil, as opposed to criminal, proceeding because it would only be facing the risk of losing the trial. Another expert based his tentative prediction that such defenses would succeed in a Swiss prosecution on the fact that BPS and the customers about whom confidential information is sought are defendants in the United States proceedings—an assumption which is no longer accurate, as discussed below. In addition, one requirement for the application of the "justifying facts" defense is that one invoking the defense must find himself in the difficult position not as a result of his own fault, a condition BPS is not likely to satisfy in any court. Consequently, it appears that the likelihood of a successful defense to a Swiss prosecution based on Article 47 is highly speculative in the circumstances of these cases. Moreover, the suggestion implicit in the affidavits of plaintiffs' experts that, in a civil case, only severe contempt fines will permit the success of one of the above defenses in a subsequent Swiss criminal prosecution would seem to encourage attempts by American courts to manipulate outcomes in a foreign legal system—which would produce the very opposite of comity.

In analyzing the hardship factor, it is also important to focus on the status in the litigation at hand of the party resisting discovery. For example, courts have found the hardship of compliance with United States production orders to be less significant where the party resisting discovery is the plaintiff in a civil suit, because it has the option of either risking penalties for violation of foreign law or abandoning the lawsuit. *See, e.g., Compagnie Francaise*, 105 F.R.D. at 31; *Trade Development Bank*, 469 F.2d at 41. On the other hand, where the party sought to be compelled to produce documents in violation of foreign secrecy laws is merely a neutral source of information, and not itself a target of a criminal investigation or an adverse party in litigation, some courts have found the hardship to weigh more heavily in the bal-

ance. *See United States v. First National Bank of Chicago,* 699 F.2d 341, 346 (7th Cir.1983). Indeed, it has been suggested that the factor which distinguished the early Second Circuit cases adopting a restrictive approach to ordering discovery in the face of foreign nondisclosure laws was the fact that they all involved a nonparty witness. *Banca Della Svizzera,* 92 F.R.D. at 114.

It is of some significance, then, that as a result of recent settlements BPS is no longer a primary defendant in these cases, and stands instead, as to the plaintiffs, in the posture of a nonparty witness. Nevertheless, BPS is not the innocent party caught up in events beyond its control that the Greek bank and its employees were in the *First National Bank of Chicago* case. Until recently, BPS was a key defendant in these cases, and whether acting as a principal or as an agent, placed itself in the thick of things by controlling the trading of massive volumes of silver futures on United States commodities markets.

Finally, as discussed above in connection with the first factor, the hardship which might be imposed on BPS now could have been avoided to some extent had it obtained waivers of Swiss secrecy from its brokerage customers prior to trading for their accounts, as the CFTC has determined it was obligated to do. *See, e.g., Vetco,* 691 F.2d at 1289–90 (had records been maintained in U.S. as required by law, discovery dispute would never have arisen).

### C.

The third factor to be considered is plaintiffs' need for the documents and information whose production it seeks to compel. Plaintiffs seek two kinds of information, relating first, to the identity and trading activity of BPS' customers and second, to BPS' own activities. The latter category includes information about a draft loss-sharing agreement in which Fustok, Nahas and Nelson Bunker Hunt agreed to bear half of BPS' $70 million in trading losses, about BPS' decision to cover at its own expense large margin calls on the accounts of its customers in January 1980, and relating to BPS' granting Advicorp an exception from a bank policy which required that all trading customers execute a waiver of Swiss banking secrecy rights.

It is important to consider what has already been disclosed. As noted earlier, plaintiffs have already obtained waivers of bank secrecy from the Hunts, International Metals Investment Co., and Fustok; BPS has obtained waivers from Advicorp, as well as several customers who are not defendants. Thus, BPS has provided full discovery with respect to all trading customers who are defendants in these actions with the exception of Nahas, who has executed a waiver of secrecy rights as to the CFTC in a related civil enforcement proceeding. Although plaintiffs contend that the CFTC discovery does not encompass all Nahas' account documents in BPS' possession and that BPS' refusal to authenticate those documents as to them may pose admissibility problems at trial, plaintiffs do not dispute that they have access to such documents pursuant to an outstanding subpoena. As to the information sought by plaintiffs regarding BPS' own activities, BPS has submitted an affidavit of one of its officers which states that it has not invoked Swiss bank secrecy to withhold any information about its own conduct, including many of the specific areas of plaintiffs' inquiry.

Against this background of substantial disclosure pursuant to waivers executed by defendant customers, plaintiffs contend that they still need information concerning customers of BPS who are not defendants but who may have participated in the alleged manipulation.

Three observations can be made about plaintiffs' discovery requests. First, based on the information already in the public domain with respect to the events in the silver market in 1979–80 and facts already uncovered in the massive discovery taken in these cases, it can be said that the information plaintiffs seek is highly relevant. Second, in litigation such as this, involving an alleged international antitrust conspir-

acy to manipulate the United States commodities markets, where deliberate steps are said to have been taken to avoid detection, the kind of business documents plaintiffs seek may be crucial to the litigation. *See In re Uranium Antitrust*, 480 F.Supp. at 1155. Third, although it is to be assumed that BPS' statements regarding its production of documents relating to its own activities have been made in good faith, the assurance of opposing counsel is no substitute for actual examination of documents by requesting counsel. *See id.*

On the other hand, plaintiffs have already obtained a significant amount of discovery for use in their case against the remaining defendants. Moreover, given the wide scope of plaintiffs' requests and interrogatories, compliance by BPS is very likely to yield much material that plaintiffs will not find useful in this litigation.

### D.

The last factor to be taken into account is the good faith shown by the party resisting discovery. With respect to its conduct since the commencement of these litigations, it would appear that BPS has "in good faith made diligent efforts," *Societe Internationale*, 357 U.S. at 208, 78 S.Ct. at 1094, to provide the discovery requested by plaintiffs. Like the petitioner in *Societe Internationale*, BPS has made extensive attempts to secure waivers of bank secrecy rights from its trading customers, albeit with limited success. BPS has also produced a substantial volume of documents, and while "sheer volume alone cannot give rise to a presumption of good faith," *Compagnie Francaise*, 105 F.R.D. at 31, the discovery heretofore provided—considered together with BPS' efforts to obtain customer consents to disclosure and the affidavit of a BPS officer to the effect that no information regarding BPS' own conduct has been withheld on grounds of Swiss bank secrecy law, *compare First National City Bank*, 396 F.2d at 905 (failure to produce or segregate documents or records which reflected bank's own work product) —certainly cuts against a finding that BPS

has exhibited bad faith in complying with plaintiffs' requests.

It is also worth noting that this is not a situation in which the party resisting discovery has relied on a sham law such as a blocking statute to refuse disclosure, *see, e.g., Compagnie Francaise*, 105 F.R.D. at 30, nor a situation in which the resisting party has not made reasonable efforts to apply to the appropriate governmental authority for an exemption to such a statute, *see, e.g., Remington Products*, 107 F.R.D. at 653.

Nevertheless, it is not altogether clear that BPS' "failure to comply [with plaintiffs' discovery requests] has been due to inability, and not to willfulness, bad faith, or any other fault," *Societe Internationale*, 357 U.S. at 212, 78 S.Ct. at 1096. This is so because BPS' pre-litigation conduct, although perhaps not rising to the level of a deliberate strategy of concealment, *see, e.g., General Atomic Co. v. Exxon Nuclear Co.*, 90 F.R.D. 290, 296–99 (S.D.Cal.1981) (storing documents abroad with expectation that they would thereby under foreign law be unavailable for discovery in anticipated litigation in United States), may be viewed as having "courted legal impediments to production [of the requested documents and information]," *Societe Internationale*, 357 U.S. at 209, 78 S.Ct. at 1094. For example, plaintiffs call attention to the fact that BPS chose to enter the U.S. silver futures market, knowing that it was subject to reporting requirements under the Commodity Exchange Act, without securing consent to disclosure from its brokerage customers. In the context of a litigation over BPS' failure to provide information in response to a request from the CFTC in October 1979, an administrative law judge found in this regard:

> The Banque knew it was subject to the reporting requirements under the [Commodities Exchange] Act before it entered the futures market. It could have prepared itself to fulfill those requirements within the strictures of Swiss privacy laws by obtaining consent to disclosure

from its brokerage customers. Instead, the Banque chose to pursue a course of conduct certain to subject it to conflicting legal requirements and plead that as a defense to [Commodities Futures Trading] Commission sanctions.

. . . .

Recordkeeping and submission in accordance with the Act and Commission regulations are prerequisite to lawful participation in a contract market. The Banque did not make a good faith attempt to comply with these provisions. Rather than planning for compliance when it entered the market, it created difficulty that need not have occurred.

*Banque Populaire Suisse,* [1980–82 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 21,-255 at 25,256–57 (footnotes omitted). While that proceeding did not involve the issue whether to compel discovery in a civil litigation, the situation presented there was analogous in that a refusal to disclose customer information on bank secrecy grounds exposes BPS to the possibility of sanctions—in the administrative proceeding, the loss of trading privileges; here, the sanctions provided for in Fed.R.Civ.P. 37(b)(2). In the same vein, plaintiffs charge that in granting Advicorp an exception to internal BPS policies requiring customers to execute bank secrecy waivers prior to trading on U.S. markets and in withholding from the CFTC documents covered by a waiver actually executed by Fustok in late 1979, BPS knowingly sought to avoid disclosure by shrouding its affairs in the Swiss secrecy laws.

BPS responds that it had the right to litigate in good faith the CFTC's right to condition trading on the disclosure of confidential customer information—an issue it contends was undecided in 1979—and that even had it obtained such customer waivers the immediate problem would still be presented owing to the limited scope of such waivers in comparison with the extent of the information requested by plaintiffs. Although these points are not without merit, the fact remains that BPS made use of U.S. commodities markets with the knowledge that it might not be adhering to what

has now been determined to be the applicable rule of disclosure. The overwhelming impression left by such conduct is that BPS "undertook such transactions fully expecting to use foreign law to shield it from the reach of our laws," *Banca Della Svizzera,* 92 F.R.D. at 119, and in this respect BPS' pre-litigation conduct evinced bad faith in the *Societe Internationale* "courting legal impediments" sense.

### V.

The various factors having been examined, the balance would appear to weigh against granting the motion to compel. The preceding analysis revealed that both the United States and Switzerland have strong national interests at stake. It is also fairly clear that compliance with an order of this court would place BPS and its employees in violation of the Swiss criminal law, with little likelihood of asserting a successful defense based on foreign judicial compulsion. Plaintiffs make a convincing argument that further discovery might supply a number of remaining pieces to the puzzle of the alleged conspiracy to manipulate the silver futures market. And although it has not been shown that BPS has not made a good faith effort to respond to plaintiffs' discovery requests within the constraints of the bank secrecy law, BPS can be said to have placed itself in harm's way by its pre-litigation conduct.

Most important among these countervailing findings, however, is the reduced degree of importance of the requested discovery in light of the waivers of bank secrecy already executed by those whom plaintiffs consider to be key players in the silver imbroglio and the discovery already taken under these waivers. This consideration counsels against a decision to issue a production order in two ways. First, a court is less willing to order a foreign witness to engage in conduct in a foreign country that will violate that country's laws, *see* Restatement (Second) § 40, factors (c) & (d) (nationality of resisting party and place where required conduct

will take place), where the need for the information located abroad is less crucial to the litigation. Second, compliance by BPS with a compulsion order will require the disclosure of confidential commercial information about all its brokerage customers even though plaintiffs do not contend that they expect information about more than a small number to be helpful to their case, with the result that the cost in international comity will be likely to exceed the benefit to the conduct of these American litigations. The significance of the factor bearing upon the importance to the litigation of the documents and information requested for a court's decision to order production of information located abroad is indicated by the prominent place it occupies in the revised balancing test contained in the newest Restatement draft. *See* Restatement (Revised) of the Foreign Relations Law of the United States § 437(1)(c) & comment a (Tent. Draft No. 7, 1986).

Finally, although not decisive in itself, it cannot be ignored that BPS is no longer a primary defendant in these cases, a reality which further removes its nondefendant trading customers—the individuals and entities whose business secrets would be revealed—from the litigations. It might be argued with some force that BPS, if it were a primary defendant, should be required to produce information plaintiffs need to make a case against BPS itself. It is less supportable, however, to order BPS to violate Swiss law when it stands vis-a-vis plaintiffs in the position of a witness, a mere source of information. This is not to say that issuing an order to compel is never appropriate in the case of a witness in a civil suit, only that under the circumstances of these proceedings such an order would not be warranted.

The fact of BPS' new status in these cases also drastically reduces the remedies available to the court in the event a production order were to be issued and BPS failed to comply. Were BPS still a party vis-a-vis the plaintiffs, the sanction of a default judgment would be available (though perhaps not invoked under these circumstances), as would the preclusion of BPS from presenting certain evidence and the inference of findings of fact adverse to BPS by the jury. In the present situation, however, the only possible response to BPS' noncompliance would be a finding of contempt accompanied by the imposition of fines. Not only might such an attempt at enforcement not succeed unless the fines reached levels substantial for an international bank, *see* Restatement (Second) § 40, factor (e) (likelihood enforcement can reasonably be expected to achieve compliance), but such a sanction—threatening a witness in a lawsuit with conflicting punitive measures by two sovereigns—would be disproportionate under the circumstances and excessively harmful to international comity.

Accordingly, it would not be an appropriate exercise of this court's power to grant plaintiffs' motion to compel.

It is so ordered.