In the Matter of the Petition of **FIRST AMERICAN CORPORATION and First American Bankshares, Inc., Petitioners,**

v.

**PRICE WATERHOUSE LLP, a limited liability partnership registered under the laws of the State of Delaware, and Price Waterhouse United Kingdom Firm, a partnership organized under the laws of England, United Kingdom, Respondents.**

No. M8–85 (RWS).

United States District Court, S.D. New York.

Dec. 17, 1997.

Jones, Day, Reavis & Pogue, New York City, for Petitioners; Steven C. Bennett, of counsel.

Debevoise & Plimpton, New York City, for Respondent Price Waterhouse LLP; Edwin G. Schallert, Barton Legum, of counsel.

Dechert Price & Rhoads, New York City, for Respondent Price Waterhouse, United Kingdom Firm; James E. Tolan, William K. Dodds, Peter L. Critchell, of counsel.

*OPINION*

SWEET, District Judge.

First American Corporation ("FAC") brings this petition for an order pursuant to Rules 37 and 45, Fed.R.Civ.P., compelling discovery from an entity FAC calls Price Waterhouse–World Wide, and from various Price Waterhouse firms, namely, Price Waterhouse–United Kingdom ("PW–UK"), Price Waterhouse North Caribbean Firm ("PW–Cayman"), Price Waterhouse Luxembourg Firm ("PW–Lux"), and Price Waterhouse Arab Emirates Firm ("PW–Emirates"). For the reasons set forth below, the petition will be granted as to PW–UK only, and denied as to PW–Lux, PW–Cayman, PW–Emirates and Price Waterhouse Worldwide.

## *Parties*

FAC is a Virginia corporation with its principal place of business in Washington D.C. During the events which led to the DC Action, FAC was a privately-held bank holding company wholly owned by Credit and Commerce American Holdings Co. N.V. ("CCAH").

PW–US is a registered limited liability partnership of independent accountants organized under Delaware law that engages in the practice of accountancy in the United States. Its principal office is in New York.

PW–UK is an English partnership set up under the Partnership Act (1890) of England. It is located and operates principally in the United Kingdom.

Clive D.J. Newton ("Newton") is a partner in PW–UK who is currently residing in New York and working for PW–US.

## *Facts and Prior Procedure*

The instant discovery motion was brought in relation to an action pending in the United States District Court for the District of Columbia, entitled *First American Corp., et al. v. Sheikh Zayed Bin Sultan al-Hahyan, et al.,* Civ. Nos. 93–1309 and 95–0877 (JHG/PJA) (the "DC Action"). The action is just one proceeding of many spawned by the largest bank fraud in world history perpetrated by the Bank of Credit and Commerce International ("BCCI"). During BCCI's growth to an organization of international proportions, it created fictitious loans, stole deposits, incurred hundreds of millions of dollars in losses from reckless trading operations, accepted illicit funds from drug launderers and corrupt dictators, and blatantly violated banking and criminal laws in virtually every jurisdiction in which it operated. The result was a $10.5 billion bank failure, and the loss of billions of dollars of depositors' savings.

## *The Underlying Action*

The DC Action was initiated by FAC to recover for alleged fraud perpetrated by the BCCI, which allegedly obtained ownership and control of FAC in contravention of U.S. banking laws, by acquiring FAC through a series of fictitious loans to nominee shareholders of CCAH, the ultimate holding company for First American, with CCAH shares pledged as security for those loans. In so doing, BCCI evaded requirements of U.S. banking law that a bank receive approval from U.S. bank regulators, such as the Federal Reserve Board, before acquiring a U.S. bank. The DC Action includes claims for civil RICO violations, common law fraud, breach of fiduciary duty, reckless and negligent misconduct, and civil conspiracy.

## *Activities of Various Price Waterhouse Firms in Relation to BCCI*

The Price Waterhouse firms were the auditors of BCCI (Overseas) Limited ("BCCI–Overseas"), a Cayman Islands bank, from its inception in 1975, and were the worldwide auditors for the entire BCCI group from 1987 until the bank was closed in June 1991. Specifically, Price Waterhouse–Cayman acted as auditor of BCCI–Overseas from its incorporation until closure. Price Waterhouse–Luxembourg was the auditor of BCCI International S.A. ("BCCI–International") and BCCI Holdings (Luxembourg) S.A. ("BCCI–Holdings") from 1987 onwards. PW–US was appointed by BCCI to issue an audit opinion of BCCI's operations in this country.

The efforts of these separate PW firms were coordinated by PW–UK. PW–UK assisted PW–Cayman with its audits of BCCI–Overseas from 1985 onwards, and was responsible for the worldwide audit of BCCI–

Holdings from 1987 onwards. PW–UK was appointed in place of the accounting firm Ernst & Whinney, BCCI's previous worldwide auditor, which had criticized BCCI management following a loss of $1 billion experienced by BCCI–Overseas in its Treasury operations. As part of its coordination of worldwide audits, PW–UK would instruct and direct the efforts of accounting firms in those territories where BCCI–Holdings' subsidiaries carried on material business. In the United States, the appointed accounting firm was PW–US.

In October 1990, PW–UK became members of a Committee of Investigation set up by the Abu Dhabi Government to investigate problem lending within BCCI. This investigation was conducted in conditions of strict secrecy. In early 1991, PW–UK was also appointed by the Bank of England to report on irregularities in BCCI's business. On July 5, 1991, based in part on PW–UK's reports, banking regulators around the world took steps to close BCCI.

After BCCI's closure, the liquidators of BCCI–Overseas, BCCI–Holdings, and BCCI–International commenced proceedings in England (the "Liquidators' Action") against PW–UK, PW–Cayman, and PW–Lux for breach of contract and/or negligence. The Liquidators are seeking damages for losses incurred by the BCCI Group arising out of loans to CCAH shareholders.

### The Subpoenas

The instant motion to compel discovery arises from two subpoenas served by FAC on PW–US and on Newton, a partner of PW–UK now residing in New York (the "Subpoenas"). The first subpoena was addressed to "Price Waterhouse" and was served in August 1997, at PW–US' main office at 1251 Avenue of the Americas. A second subpoena, (the "Subpoena"), requesting the same information and addressed to "Price Waterhouse c/o Mr. Clive Newton" was served at the Connecticut home of Newton, a partner of PW–UK who is currently residing in the United States and working for PW–US. At PW–UK, Newton had worked as the partner responsible for human resources issues relating to management consultancy services in

Europe. At PW–US, Newton works in a similar position.

"Schedule A" attached to the Subpoenas defined "Price Waterhouse" as:

the worldwide accounting firm of Price Waterhouse that operates or has operated as a partnership by estoppel in the United States, United Kingdom, Cayman Islands and Luxembourg, including, but not limited to any other affiliated divisions, entities or Price Waterhouse firms, and any affiliated parents, subsidiaries, partnerships, divisions, affiliates, successors and predecessors, and each of their partners, employees, agents, representatives or any other persons acting or purporting to act for or on their behalf.

The Subpoenas separately define "Price Waterhouse–US", "Price Waterhouse–UK", "Price Waterhouse–Cayman", and "Price Waterhouse–Emirates" each as an "entity or division of [the purported worldwide firm of] Price Waterhouse" operating in the designated location.

The Subpoenas requested documents from "Price Waterhouse (including Price Waterhouse–UK, Price Waterhouse–Luxembourg, Price Waterhouse–Cayman and Price Waterhouse–Emirates)" related to CCAH and BCCI, and any services performed by "Price Waterhouse" for those companies.

On September 3, 1997, PW–US served its objections to the Subpoena on the following grounds: (1) there is no single legal entity "Price Waterhouse" that includes the various Price Waterhouse partnerships or entities operating in the United States, the United Kingdom, the Cayman Islands, the United Arab Emirates and Luxembourg, nor is there any "partnership by estoppel" between these entities; (2) the documents listed in the Subpoenas which are in the possession of the other Price Waterhouse partnerships were not in the control of PW–US; (3) PW–US is not the appropriate vehicle for serving, obtaining jurisdiction over and/or taking discovery from any of the individual Price Waterhouse firms operating outside the U.S., therefore no proper service had been made on these firms, and no jurisdiction established by serving PW–US; (4) the Subpoena is an attempt to circumvent available

procedures under the Hague Convention for taking discovery from foreign entities, and violates the principles of comity; (5) the document requests were unreasonably cumulative and duplicative of a subpoena served on PW–US in September 3, 1996, in response to which PW–US produced over 33,000 pages of documents.

One meeting occurred between counsel of FAC and PW–US to discuss the Subpoenas, but no resolution was reached. FAC's counsel thereupon brought an application by ex parte order to show cause dated September 30, 1997, asserting that service of the Subpoenas provided jurisdiction to this Court to compel all the named Price Waterhouse firms to produce documents. The Honorable Robert P. Patterson, sitting in Part 1, granted the Order to show Cause and set forth a briefing schedule. The petition was heard in Part 1 before this Court on October 28, 1997.

### Discussion

### Jurisdiction over All Price Waterhouse Firms via Partnership By Estoppel

■ FAC asserts jurisdiction over PW–UK, PW–Cayman, PW–Luxembourg and PW–Emirates via service on PW–US on the grounds that Price Waterhouse must be treated as a world-wide partnership, according to the doctrine of partnership by estoppel. The doctrine of partnership by estoppel, which is part of the Uniform Partnership Act, has been codified in New York law and states that:

> When a person, by words spoken or written or by conduct, represents himself, or consents to another representing him to anyone, as a partner in an existing partnership or with one or more persons not actual partners, he is liable to any such person to whom such representation has been made, who has, on the faith of such representation, given credit to the actual or apparent partnership, and if he has made such representation or consented to its being made in a public manner he is liable to such person, whether the representation has or has not been made or communicated to such person so giving credit by or with the knowledge of the apparent partner making the representation or consenting to its being made.

N.Y. Partnership Law § 27(1) (McKinney's 1988). Partnership by estoppel should not be lightly invoked and generally presents issues of fact. *Royal Bank and Trust Company v. Weintraub, Gold & Alper*, 68 N.Y.2d 124, 129, 497 N.E.2d 289, 291–92, 506 N.Y.S.2d 151, 153–54 (1986).

■ Partnership by estoppel thus contains two elements. First, that sufficient indicia of partnership be presented to the injured party to constitute a representation that the partnership exists. *Royal Bank, supra* (summary judgment granted estopping defendant from denying partnership where firm space, telephone number, telephone book listing and stationery continued to indicate partnership two years after dissolution); *Ranieri v. Leavy*, 180 A.D.2d 723, 580 N.Y.S.2d 366 (1992) (individual owner of company not liable for payments because no partnership by estoppel established where only relevant indicia that partnership existed was name of company on front page of agreement and fact that plaintiff made check out to company). *John's Inc. v. Island Garden Center of Nassau, Inc.*, 49 Misc.2d 1086, 269 N.Y.S.2d 231, 235–36 (1966) *aff'd*, 53 Misc.2d 1021, 280 N.Y.S.2d 34 (1967) (joint venture by estoppel found where defendants described themselves as part of joint venture in brochure, single individual presented as president of joint venture, one of corporations described as "branch" of alleged single venture, true corporate names of each entity obscured, one corporation promised payment to a creditor as soon as insurance monies received by another "branch" and bookkeeping of all corporations was centralized).

Second, the injured party must have relied on this representation to his or her detriment. *Milano v. Freed*, 64 F.3d 91, 98 (2d Cir .1995); *Stochastic Decisions, Inc. v. DiDomenico*, 995 F.2d 1158, 1169 (2d Cir.1993) (no partnership by estoppel established where plaintiff failed to allege that it gave credit to defendant on basis of representations of partnership); *Fleet Bank N.H. v. Royall*, 218 A.D.2d 727, 630 N.Y.S.2d 559, 560 (1995) (defendant estopped from denying existence of partnership where he held him-

self out as partner in business and plaintiff promissory note issued in reliance); *Mulvey v. Hamilton*, 57 A.D.2d 995, 394 N.Y.S.2d 318, 319 (1977) (partnership by estoppel where joint venturer held himself out as partner in project and plaintiff performed services in reliance upon representation); *see also, Young v. Federal Deposit Insurance Corporation*, 103 F.3d 1180, 1192 (4th Cir. 1997) (partnership by estoppel between PW–US and PW–Bahamas not established under Uniform Partnership Act where plaintiff failed to show extension of credit or reliance based on Price Waterhouse's representations of world-wide partnership).

█ As evidence of representations of partnership, FAC asserts that Price Waterhouse represented itself to BCCI as a worldwide partnership, and characterized its numerous geographic locations as offices, rather than separate partnerships or entities. The former CEO and the former CFO of BCCI each testified that PW–Cayman and PW–UK represented themselves to BCCI as one integrated firm, and that Price Waterhouse brochures were submitted to BCCI emphasizing Price Waterhouse's global integration as a critical strength of the firm. Communications from Price Waterhouse to BCCI referred to Price Waterhouse as the "sole auditor" of BCCI. A partner in PW–UK signed financial statements for 1987 for BCCI Overseas, BCCI Holdings and BCCI International on behalf of "Price Waterhouse" without any geographic limitation. This practice of certifying BCCI's financial statements simply by "Price Waterhouse" continued until BCCI collapsed in June 1991.

FAC cites the 1985 audit of BCCI Overseas as a particular example of the manner in which Price Waterhouse's separate offices function as a single partnership. During the 1985 audit, PW–UK discovered that BCCI Overseas had experienced losses of nearly $1 billion from 1981 through 1985, and took control of the audit from PW–Cayman. This shift in control was portrayed to BCCI as simply a shift from one portion of the worldwide entity to another.

FCA also cites the relationship between PW–US and PW–UK as one of partnership rather than separate entities. FCA asserts that PW–UK controlled and managed the worldwide audit of BCCI from 1987 onwards, working with PW–US as its partner and using PW–US as its agent. A partner in PW–UK, Christopher Cowan, testified that PW–UK used its sister PW offices as agents:

> At the end of the day I think it comes down to effectively an agency relationship ... if the ultimate responsibility [for the audit] is of, shall we say, the Grand Cayman firm and they seek to use services of the U.K. firm then they are effectively contracting to use those services, so they are acting as their agent.

Finally, FAC also asserts that Price Waterhouse markets itself as a worldwide entity in its brochures and advertisements.

While the facts set forth above may establish representations of partnership and reliance as to BCCI, they do not demonstrate such representations and reliance by FAC. FAC contends that it relied upon the above representations "as part of the BCCI group". However, it is not clear that such indirect reliance satisfies the requirements of New York law. Courts have required a stronger showing of reliance before imposing liability based on partnership by estoppel. In *Milano*, 64 F.3d at 98, a medical malpractice action, the Second Circuit held that although one of the defendant doctors had represented herself as a partner in the doctors' group, nothing in the record indicated that the plaintiffs had selected the group on the strength of her representations. *Id.*, at 98 (citing N.Y. Partnership Law § 27). The Second Circuit cited *Hartford Accident & Indemnity Co. v. Oles*, 152 Misc. 876, 878, 274 N.Y.S. 349, 353 (N.Y.Sup.1934) for the proposition that "there must ... be evidence that the representation 'influence[d] the other party to act.'" Without a direct influence to act, liability could not be imposed.

In *Young*, 103 F.3d at 1192, the Fourth Circuit applied South Carolina law, which has adopted the identical provision regarding partnership by estoppel from the Uniform Partnership Act as that codified in New York law. The Circuit held that the plaintiff investor could not establish personal jurisdic-

tion over Price Waterhouse–Bahamas ("PW–Bahamas") in South Carolina under the doctrine of partnership by estoppel, because he had not contended that he relied upon PW–Bahamas brochures in making his decision to invest. *Id.* In the instant case, without the requisite showing of direct reliance to its detriment on Price Waterhouse's representations of partnership, FAC cannot establish that worldwide partnership and its corollary, personal jurisdiction.[1]

### Jurisdiction Over PW–UK

FAC contends that even if jurisdiction is not established via partnership by estoppel, jurisdiction exists over PW–UK on several separate grounds: that FAC's service on a partner of PW–UK in Connecticut effects service on PW–UK itself; that PW–UK has been doing business in New York; and that PW–UK has transacted business in New York sufficient to invoke long-arm jurisdiction.

### Jurisdiction over PW–UK May Not Be Obtained Simply By Virtue of Service on Clive Newton[2]

■ First, FAC asserts that service of the subpoena on Newton, a partner in PW–UK, is sufficient to confer jurisdiction over PW–UK. Under New York law, a partnership is deemed to reside wherever any of its partners reside. N.Y.C.P.L.R. § 310 (McKinney's 1988) ("Personal service upon persons conducting a business as a partnership may be made by personally serving the summons within the state upon any one of them."); *see, e.g., Rait v. Jacobs Bros.*, 49 Misc.2d 903, 268 N.Y.S.2d 750, 751 (1966) (citing N.Y.C.P.L.R.

1. PW–US contends that, whether or not FAC met the requirements of N.Y. Partnership Law § 27, personal jurisdiction via estoppel is not available under New York law. PW–US relies upon two cases for this assertion. In *Gelfand v. Tanner Motor Tours, Ltd.*, 339 F.2d 317 (2d Cir.1964), the plaintiff contended that defendant bus line had represented itself as doing business within New York, and so was estopped from contesting personal jurisdiction. *Id.*, at 320. The Second Circuit surveyed New York law as it stood at that time and concluded that New York had no doctrine of jurisdiction by estoppel. *Id.*, at 320–21.

 Two New York trial courts have permitted jurisdiction by estoppel since Gelfand. *See, Farmingdale Steer–Inn, Inc. v. Steer Inn Realty Corp.*, 51 Misc.2d 986, 987–88, 274 N.Y.S.2d 379, 380–81 (1966) (service on defendant who represented itself as authorized to do business in this state sufficient; "[I]t would be hostile to our State policy as expressed in statutes [General Corporation Law, § 218, Business Corporation Law § 1312] to permit the defendant to deny now that it was present in this State"); *John's, Inc.*, 49 Misc.2d at 1091, 269 N.Y.S.2d at 236 (service on defendants who held themselves out as joint venturers constituted good and valid service of process on other corporate defendants). Thus it would appear that the *Gelfand* court holding that New York law does not permit jurisdiction by estoppel has been altered in subsequent years.

 Nonetheless, *Gelfand* has been cited by recent district court decisions as good law. In *Howard v. Klynveld Peat Marwick Goerdeler*, 977 F.Supp. 654, 663 (S.D.N.Y.1997), the court found that the plaintiff had failed to establish jurisdiction over foreign partners of her former employer via partnership by estoppel in part because she had not shown detrimental reliance, but largely because "New York does not recognize a theory of jurisdiction by estoppel." *Id.* In *Pfaff American Sales Corp. v. M.V. Tadeusz Kosciuszko*, No. 82 Civ.

7659(RLC), 1984 WL 1333, at *2 (S.D.N.Y. Dec.13, 1984), the court cited *Gelfand* to defeat the plaintiff's contention that the defendant should be estopped contesting jurisdiction because it had represented itself as doing business in New York. The court referred to *Farmingdale* as the only the single post-*Gelfand* decision to permit jurisdiction on estoppel principles, but because it did not find any other such decision, the court dismissed *Farmingdale* as "a sport." *Id.*

Without determination by a higher court than those in *John's Inc.*, and *Farmingdale*, it is unclear whether or not jurisdiction by estoppel is permitted under New York law. *See,* McKinney's Practice Commentary, N.Y.C.P.L.R. § 301, comment 301:5 (McKinney's 1988) ("[*Farmingdale*] seems sound in principle but in view of the generally cool reception this argument has received in the past, the question will remain unsettled until the appellate courts get another chance to review it.") This issue need not be resolved in the instant case because FAC has not shown the reliance necessary to reach the question of jurisdiction.

2. PW–UK contends that the addressee of the Subpoena, "Price Waterhouse c/o Clive D.J. Newton" was insufficient to reach PW–UK. This information may not have provided actual notice to PW–UK that its firm was the object of service. The service on Newton occurred after PW–US notified FAC that the initial subpoena, served at the PW–US office, had been mispaginated. Because Newton is residing in the United States as an employee of PW–US, service of the Subpoena at his residence could be viewed merely as corrected service on PW–US. To the extent that service was insufficient, the deficiency may be cured by re-service directed towards Newton, but addressed specifically to PW–UK.

§§ 310, 503(d)); *Bulkley v. O'Donnell,* 148 Misc. 186, 265 N.Y.S. 495, *aff'd,* 240 A.D. 929, 267 N.Y.S. 983 (1933); *Reading Metal Craft Co. v. Hopf Drive Assocs.,* 694 F.Supp. 98, 101 (E.D.Pa.1988) (holding that under New York law "[j]urisdiction over a partnership does not focus on its principal place of business; it is concerned with the residences of its component partners.") (citing *Rait, supra* ). FAC ignores the fact that Newton was served at his residence in Connecticut, which obviously is not subject to New York law. "[W]e have never accepted the proposition that state lines are irrelevant for jurisdictional purposes, nor could we, and remain faithful to the principles of interstate federalism embodied in the Constitution." *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 293, 100 S.Ct. 559, 565; 62 L.Ed.2d 490 (1979).

Even if service on Newton had occurred within New York pursuant to § 310, N.Y.C.P.L.R., under the specific circumstances of the case, that service may not satisfy the due process requirements underlying imposition of personal jurisdiction.

"The requirement that a court have personal jurisdiction flows ... from the Due Process Clause." *Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 702, 102 S.Ct. 2099, 2104, 72 L.Ed.2d 492 (1982). In order to exercise personal jurisdiction over a nonresident party, there must be minimum contacts between the nonresident and the state, *World–Wide Volkswagen,* 444 U.S. at 291, 100 S.Ct. at 564, and maintenance of the suit must not offend "traditional notions of fair play and substantial justice". *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945). The Supreme Court has elaborated on the protection contained in the requirement of minimum contacts:

> The Due Process Clause protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful contacts, ties, or relations. . . . By requiring that individuals have fair warning that a particular activity may subject them to the jurisdiction of a foreign sovereign, the Due Process Clause gives a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit.

*Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 471–72, 105 S.Ct. 2174, 2181–82, 85 L.Ed.2d 528 (1985) (original quotation marks and citations omitted).

■ The "fair warning" requirement imposed by the Due Process Clause is not satisfied by the mere residence of Newton in Connecticut. Newton took up his residence in Connecticut in order to act as a visiting employee of PW–US; he is currently performing work for PW–US only and not for PW–UK, being paid by PW–US and is himself paying U.S. taxes. These activities by Newton are not connected to his status as a partner of PW–UK, and do not provide any warning to PW–UK of possible imposition of personal jurisdiction by a New York court:

> Where a forum seeks to assert specific jurisdiction over an out-of-state defendant who has not consented to suit there, this fair warning requirement is satisfied if the defendant has *purposefully directed his activities at residents of the forum, and the litigation results from alleged injuries that arise out of or relate to those activities.*

*Burger King,* 471 U.S. at 472, 105 S.Ct. at 2181–82 (emphasis added). The mere residence in the United States of a partner of a foreign partnership, where that partner is on leave from the partnership and is performing work for a separate corporation, is insufficient to satisfy the requirements of Due Process and thus provide personal jurisdiction.

### Jurisdiction Over PW–UK May Be Obtained By Virtue of PW–UK's Activities in the State Through PW–US

As an alternate ground for personal jurisdiction, FAC contends that PW–UK has done business in New York, both itself and by using PW–US as its agent. Of the facts which FAC marshals in support of this contention, the following appear significant: from 1987 through 1991, PW–UK sent detailed instructions to and repeatedly com-

municated with persons in New York, particularly at PW–US, when conducting its worldwide audit of BCCI, including BCCI's New York branch; and the lead engagement partner from PW–UK made trips to New York to work on BCCI-related matters and worked with PW–US personnel in executing these tasks.

FAC also asserts that PW–UK did business in New York through PW–US, using the latter firm as its agent, on the grounds that: PW–UK controlled every significant aspect of PW–US's audits of BCCI's New York branch from 1987 to 1991; PW–US partners repeatedly looked to PW–UK for direction in conducting the BCCI audits; the lead engagement partner from PW–UK testified that an agency relationship arose when any office of PW employed its sister offices to perform regional audit services; and a PW–US partner testified that he owed a duty to report to the PW–UK partner whenever anything material happened in regards to BCCI, and that the PW–UK partner owed him the same duty.

■ A foreign corporation may be found to be doing business in New York if it is "engaged in such a continuous and systematic course of doing business here as to warrant a finding of its presence in this jurisdiction." *Frummer v. Hilton Hotels International, Inc.*, 19 N.Y.2d 533, 536, 227 N.E.2d 851, 853, 281 N.Y.S.2d 41, 43 (N.Y. 1967). The test for doing business typically is met by the following factors: the existence of an office in New York; the solicitation of business in the state; the presence of bank accounts and other property in the state; and the presence of employees of the foreign party in the state. *Hoffritz for Cutlery, Inc. v. Amajac, Ltd.*, 763 F.2d 55, 58 (2d Cir. 1985). Solicitation of business alone, however, will not confer personal jurisdiction. *Gelfand*, 339 F.2d at 323 (citing *Miller v. Surf*

*Properties, Inc.*, 4 N.Y.2d 475, 176 N.Y.S.2d 318, 151 N.E.2d 874 (1958)).

■ The activities attributed to PW–UK alone do not satisfy the *Hoffritz* factors set forth above. FAC does not assert that PW–UK owns property or bank accounts in New York, or maintains an office or a steady presence of employees in the state.[3] The activities concerning the audit of BCCI may amount to more than mere solicitation of business, may indeed be the conducting of business, but this alone cannot meet the high standard of "doing business".[4]

■ While the facts asserted as to PW–UK itself doing business do not satisfy the *Hoffritz* factors, those concerning PW–UK doing business through PW–US' agency are more persuasive. In *Frummer*, the New York Court of Appeals held that an agency relationship supporting jurisdiction was established where one corporation "does all the business which [the other corporation] could do were it here by its own officials." *Frummer*, 19 N.Y.2d at 537, 227 N.E.2d at 854, 281 N.Y.S.2d at 44; *see also, Gelfand*, 385 F.2d at 121 ("a foreign corporation is doing business in New York ... when its New York representative provides services beyond mere solicitation and [which] are sufficiently important to the foreign corporation that if it did not have a representative to perform them, the corporation's own officials would undertake to perform substantially similar services.") The resident corporation acting as an agent need not bear an official agency relationship to the foreign corporation, *see, Tuxxedo Network v. Hughes Communications Carrier*, 753 F.Supp. 514, 517 (S.D.N.Y. 1990), nor indeed any legal relationship to the foreign corporation at all:

A foreign corporation may also be subject to jurisdiction in New York under § 301 [N.Y.C.P.L.R.] when a separate corporation, acting with its authority and for its substantial benefit, carries out activities in

---

**3.** Newton's presence in New York cannot be used to meet the test, because he is not in the active employ of PW–UK.

**4.** The activities related to BCCI's audit might meet the "transacting business" test of New York's long arm statute, N.Y.C.P.L.R. § 302(a), but the statute imposes personal jurisdiction only

where the cause of action arises from that transaction of business. By these terms, the reach of long-arm jurisdiction appears to be limited to non-domiciliary defendants. Research yields no example of long-arm jurisdiction being imposed on a non-party witness in order to obtain discovery.

New York that are more than 'mere solicitation' and are sufficiently important to the foreign corporation that if it did not have a representative to perform them, the corporations own officials would undertake to perform substantially similar services.

*Volkswagen De Mexico, S.A. v. Germanischer Lloyd,* 768 F.Supp. 1023, 1027 (S.D.N.Y. 1991) (quoting *Gelfand,* 385 F.2d at 121); *see also, Tuxxedo, supra.*

In *Frummer,* the plaintiff sought to impose personal jurisdiction over Hilton–UK on the grounds that it did business in New York through a reservation service which had a New York office, bank account and telephone number. The reservation service obtained rates for the hotel, confirmed availability, made reservations, performed public relations and publicity work, and in general helped to generate business for Hilton–UK. "In short—and this is the significant and pivotal factor—the Service does all the business which Hilton (U.K.) could do were it here by its own officials." 19 N.Y.2d at 537, 227 N.E.2d at 854, 281 N.Y.S.2d at 44.[5] In *Palmieri v. Estefan,* 793 F.Supp. 1182 (S.D.N.Y.1992), the plaintiff sought to implead the foreign affiliates of Sony Music Inc. None of the Sony affiliates maintained an office or bank account in the United States, and all operated under the laws of foreign countries. However, the court found that:

[M]uch of the product marketed abroad derives from the recordings of artists signed by Sony Music in New York. Second, the foreign subsidiaries market their material in New York exclusively through Sony Music, the New York corporation. And it is through Sony Music ... that the foreign subsidiaries are able to market their products throughout the world.

*Id.* at 1192.

■ In the instant case, as set forth above, PW–UK conducted the U.S. portion of its worldwide audit of BCCI through PW–US. PW–UK issued detailed instructions on how the audit should be conducted, identified specific areas of inquiry and dictated the form and manner in which PW–US would report its findings to London. One of the PW–US partners described the U.S. audits as "fill in the blanks exercise" directed by PW–UK. Had PW–US not been present in New York, PW–UK would undoubtedly have had to send its employees here to perform these activities.

As set forth above, the domestic agent need not be an official agent or even legally related to the foreign corporation to establish an agency function sufficient to support jurisdiction. However, inquiry into the relationship between the two companies may support the inference of that agency function. *Frummer,* cite, *Palmieri,* cite. Although PW–UK and PW–US have denied any partnership, and asserted that they exist as separate firms bearing the same name, their coordinated activities indicate an affiliation closer than that of unrelated corporations. This affiliation may not amount to one of parent and subsidiary, or common ownership, but it lends its weight to a determination that personal jurisdiction may be imposed over PW–UK based on its activities in the United States conducted through PW–US.

### Due Process "Minimal Contacts" Test is Satisfied by PW–UK's Purposeful Activities in New York Through Its Agent PW–US

■ The purposeful activities of PW–UK in the United States also satisfy the "minimal contacts" required by the Due Process Clause. The extensive audit of BCCI's New York office and other United States branches, and the participation in defending BCCI from investigation in the United States should have provided PW–UK with a "fair warning that [this] particular activity may subject them to the jurisdiction of a foreign sovereign." 471 U.S. at 471–72, 105 S.Ct. at 2181–82. Through these activities, PW–UK has "purposefully avail[ed] itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws", 471 U.S. at 475, 105 S.Ct. at 2183–84 (quoting *Hanson v. Denckla,* 357

**5.** While the reservation service and Hilton U.K. were commonly owned, the *Frummer* Court weighed this factor only for its support of "a valid inference as to the broad scope of the agency in the absence of an express agency agreement." 19 N.Y.2d at 538, 227 N.E.2d at 854, 281 N.Y.S.2d at 45.

U.S. 235, 253, 78 S.Ct. 1228, 1239–40, 2 L.Ed.2d 1283 (1958)):

> Thus where the [non-domiciliary] 'deliberately' has engaged in significant activities within a State, or has created 'continuing obligations' between himself and residents of the forum, he manifestly has availed himself of the privilege of conducting business there, and because his activities are shielded by 'the benefits and protections' of the forum's laws it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well.

471 U.S. at 475–76, 105 S.Ct. at 2183–84.

### Considerations of International Comity

■■■ PW–UK asserts that FAC is obligated to seek discovery through the Hague Evidence Convention (the "Hague Convention") by considerations of international comity. In *Societe Nationale Industrielle Aerospatiale v. United States District Court*, 482 U.S. 522, 107 S.Ct. 2542, 96 L.Ed.2d 461 (1987), the Supreme Court held that the Hague Convention was not the exclusive means for conducting discovery on a foreign entity, 482 U.S. at 539–40, 107 S.Ct. at 2553–54, nor must it be the means of first resort. 482 U.S. at 541–42, 107 S.Ct. at 2554–55. While refusing to impose a generalized rule, the Court suggested that concerns of international comity required that "American courts ... take care to demonstrate due respect for any special problem confronted by the foreign litigant on account of its nationality or the location of its operations, and for any sovereign interest expressed by a foreign state." 482 U.S. at 546, 107 S.Ct. at 2557. Such considerations were undertaken by the district court in *Minpeco, S.A. v. Conticommodity Services, Inc.*, 116 F.R.D. 517 (S.D.N.Y.1987), decided two weeks after *Aerospatiale*. In *Minpeco*, the plaintiff sought discovery of information from a Swiss bank which was protected by the Swiss bank secrecy law. Noting that the Second Circuit "has consistently considered foreign law implications in reviewing [ ] orders to compel [discovery]", *id.*, at 521, the court identified four factors which could be used to guide a determination of the reasonableness of the movant's foreign discovery request: (1) the competing interests of the nations whose laws are in conflict; (2) the hardship of compliance on the party or witness from whom discovery is sought; (3) the importance to the litigation of the information and documents requested; and (4) the good faith of the party resisting discovery. *Id.* at 523.

### i. *Competing National Interests*

■■■ The United States certainly has a strong national interest in fully and fairly adjudicating matters before its courts. *Id.* at 524. The *Minpeco* court was faced with a private civil action which asserted rights under the antitrust, commodities, and racketeering statutes. The court held that a strong public interest existed in actions brought pursuant to such statutes which have the intended effect of enforcing the law by means of private attorney generals. *Id.* at 523. The instant action, asserting rights under the laws prohibiting bank fraud, and concerns one of the largest bank fraud schemes in history. In the words of the *Minpeco* court, "it is difficult to imagine a private commercial lawsuit which could be more infused with the public interest." *Id.* at 523–24.

PW–UK asserts that the laws of England and Cayman would bar disclosure of many documents covered by the Subpoena. PW–UK identifies five legal impediments that would constrain PW–UK's ability to lawfully comply with this Subpoena: (1) injunctions obtained in English Court by former BCCI customers preventing disclosure by BCCI of information relating to certain individual accounts; (2) banker/customer confidentiality obligations under English law; (3) Section 4 of the Cayman Islands Confidential Relationship (Preservation) Law (1995 Revision); (4) Section 82 of the English Banking Act of 1987; and (5) implied undertakings under English Law restricting use of documents received in discovery in the Liquidation Proceedings.

England and the Cayman Islands certainly have an interest in maintaining confidentiality as provided by the laws set forth above. However, in each instance, as set forth below, the laws themselves permit qualification

where sufficient need is demonstrated. The existence of qualifications raises the inference that the national interest in these confidentiality laws is more flexible than absolute. Second, it is unclear the extent to which the cited laws affect documents requested in the Subpoena. To the extent that English or Cayman law is not truly implicated, those countries do not have any interest in preventing the disputed discovery. *See, Alfadda v. Fenn,* 149 F.R.D. 28, 35 (S.D.N.Y.1993).

Proceeding, then, to consideration of each of the legal impediments in turn: as to the customer injunctions, PW–UK has sought and gained variations of the injunctions in English court. No reason has been presented why variations permitting response to FAC's subpoena could not also be obtained.

As to banker/customer confidentiality obligations, PW–UK stated that English law permits two qualifications of that obligation where disclosure is under compulsion of law, and, second, where there is a duty to the public to disclose. *Tournier v. United Provincial and Union Bank of England,* 1 KB 461 (1924). PW–UK cites a Hong Kong case in which the court found that a foreign subpoena from a New York district court did not come within the qualification of compulsion of law. While PW–UK supposes that an English Court would follow the same reasoning, this is not a certainty. PW–UK also doubts that an English Court would find that a foreign subpoena falls within the qualification of public interest. However, in *Price Waterhouse (a firm) v. BCCI Holdings (Luxembourg) SA,* Chancery Division [1992] BCLC 583, an English court recognized that the duty of confidentiality is outweighed by a countervailing public interest in disclosure of fraud, the very issue at stake in this action.[6]

As to the Cayman laws on confidentiality in banking, to the extent that documents in the control of PW–UK are affected by the Cayman laws, PW–UK asserts that it is required to apply for permission to disclose, and if permission is refused, PW–UK will be

faced with the Hobson's choice of committing a criminal offense under the laws of Cayman or contempt under the laws of the United States. If these events occur, PW–UK can present its predicament as the "substantial justification" permitted by Rule 37(c)(1), Fed. R.Civ.P., for refusal to disclose, and contempt sanctions would thus be obviated.

As to the English Banking Act, of 1987, which imposes a criminal penalty for disclosure without consent of information relating to the business or other affairs of an person, if such the law does embrace documents which would be responsive to FAC's subpoena, and no consent is forthcoming, PW–UK can present these facts as substantial justification for failure to disclose.

Finally, as to the implied undertakings for use of documents obtained on discovery, according to PW–UK, English law imposes an undertaking that documents obtained on discovery may only be used for the purposes of the proceedings in which they are obtained. PW–UK theorizes that the subpoena is broad enough to encompass documents obtained in an action brought by BCCI's liquidators, and that consent from various parties involved in that action would therefore be required before disclosure to FAC. Again, the attempt must be made before the barrier can be termed insuperable. If, after diligent effort, PW–UK cannot obtain consent to disclose the implicated documents, this fact may be presented to the United States court as substantial justification of non-disclosure.

In sum, the United States interest in resolving the important and far-reaching disputes involved in this action outweigh any interest held by England or the Cayman Islands in absolute preservation of their confidentiality laws.

### ii. *Hardship to PW–UK and Importance of the Documents Requested to the Litigation*

PW–UK asserts hardship in part based on the legal liabilities raised by potential viola-

---

**6.** The *Price Waterhouse* Court held:

The courts have, however, always refused to uphold the right to confidence when to do so would be to cover up wrongdoing. In *Gartside v. Outram,* (1856) 26 LJ Ch 113 it was said that

there could be no confidence in iniquity. This approach has been developed in the modern authorities to include cases in which it is in the public interest that the confidential information should be disclosed.

tions of English and Cayman confidentiality laws on the one hand, and contempt of the discovery order before this Court on the other. As set forth above, this concern may be unwarranted, both because it is untested whether consent will be withheld to disclose those documents protected by foreign law, and because prohibition of foreign law may be presented as the "substantial justification" permitted for nondisclosure by Rule 37(c), Fed.R.Civ.P.

 PW–UK also contends that compliance with the Subpoena will impose great cost and burden, because the Subpoena is over broad, while the information it requests is of questionable relevance. The objection of cost and burdensomeness is best answered by examination of the scope of this action. The extent of the BCCI fraud was global, and lasted over fifteen years. Discovery for any action in the wake of such extended and complicated misdoings will be commensurately extensive. Nor are the documents requested irrelevant. The DC Action concerns the relationship between BCCI and CCAH. The defendants in that action have denied that BCCI acquired CCAH through illegal loans, or have denied that they were aware of that ownership. The Subpoena focuses on the issues of the DC Action—the relationship between BCCI and CCAH and the violation of any laws arising out of that relationship. This information will assist FAC in establishing whether the transactions between BCCI and its CCAH nominees were valid loans and the extent of the defendants' awareness. Thus, the burden to PW–UK, while significant, is appropriate to the scope of the action, while the importance of the documents requested to the litigation has been strongly established.

### iii. *Good Faith of PW–UK*

FAC has not alleged that PW–UK has acted in bad faith, and, as PW–UK points out, no opportunity for any bad faith conduct has been afforded because subsequent to the service of PW–UK's objections to the Subpoena, FAC brought this motion to compel by order to show cause.

In sum, principles of comity do not weigh against granting the order to compel PW–UK to respond to the Subpoena.

### *Conclusion*

For the reasons set forth above, the motion to compel discovery is denied as to PW–Cayman, PW–Lux, and PW–Emirates. The motion is granted as to PW–UK.

It is so ordered.