**LAKER AIRWAYS LIMITED, Plaintiff,**

v.

**PAN AMERICAN WORLD AIRWAYS, et al., Defendants.**

### No. M 8–85.

United States District Court, S.D. New York.

March 21, 1985.

Robert M. Beckman, Beckman & Kirstein, Thomas P. Lynch, Lynch, Rowin, Burnbaum & Crystal, New York City, for plaintiff.

Michael J. Chepiga, New York City, for Witness Montagu.

Robert S. Fischler, Shearmon & Sterling, New York City, for Witness Midland Bank.

## MEMORANDUM AND ORDER

BRIEANT, District Judge.

By separate motions argued together and fully submitted on March 12, 1985, Midland Bank plc ("Midland") and Samuel Montagu & Co. Ltd. ("Montagu") moved for orders pursuant to Rule 45(b), F.R. Civ.P. quashing deposition subpoenas *duces tecum*, which were served respectively in this district on the Midland Bank's New York branch office, and upon Montagu's New York Representative Office, or agency, also in this district, by plaintiff.

The subpoenas seek information and documents from movant non-party witnesses in the above entitled action, which is now pending in the United States District Court for the District of Columbia, under docket number 82–3362.

We describe briefly the underlying action. It is a private civil action seeking treble damages for federal antitrust violations alleged to have resulted in injury to Laker Airways Limited ("Laker") at one time a well-known British passenger airline of which Sir Freddie Laker was the founder and chief executive officer. On February 5, 1982, Laker ceased doing business due to insolvency, and on February 17, 1982 an individual residing in the United Kingdom was appointed Liquidator.

The action filed November 24, 1982 and thereafter consolidated with companion cases thereafter filed, alleges that plaintiff, described as a "foreign corporation in liquidation," exists under the laws of the Island of Jersey in the Channel Islands having its principal office in London, England. Plaintiff is represented to this Court to be insolvent allegedly as a result of the tortious and conspiratorial misconduct of various defendant American, British, Swiss, German, Dutch and Belgian airlines, the British Airways Board, an American aircraft manufacturer, and its finance subsidiary.

The thrust of the two-pronged complaint is, first, that "the airline defendants agreed to a predatory scheme to destroy Trans Atlantic Charters and Laker's scheduled Skytrain [passenger] service by offering, among other things, high cost service, at prices below the costs of those services." (Complaint ¶ 18). After alleging other wrongful competition, which need not concern us here, the complaint also alleged as a second factual basis, that "Laker realized in May of 1981 that it might be unable to meet its aircraft loan repayment requirements in January 1982 and explained the situation to its lenders." (Complaint ¶ 24). In ¶ 30, the Complaint alleges that "by Christmas Eve 1981 Laker was advised that all of the lenders had agreed to provide the necessary finance" to reschedule Laker's debts. It is then alleged that certain named airline defendants "pressured Laker's lenders" to deny Laker the necessary finance so as to force Laker out of business, that the lender defendants continued to mislead Laker into believing that the financing was being provided as agreed, that Laker relied on this misrepresentation to its detriment and did not seek other sources of financing.

The non-party witnesses Midland and Montagu are not sued in the District of Columbia at this time. Implicit, however, is the suggestion that they are among the "lenders" believed by plaintiff to have colluded with Laker's competitors to deny financing to Laker.

Movants have not been sued because a court in the United Kingdom enjoined such action by the Laker Liquidator, a person subject to its jurisdiction. A motion is pending to vacate that injunction in light of a decision subsequently rendered by the House of Lords in a related case, *British Airways v. Laker Airways*, decided July 19, 1984, 3 W.L.R. 416. It is highly likely that the injunction will be vacated in the due course of time, and thereafter movants will be named as additional parties defendant in the District Court of the District of Columbia. *See generally Laker Airways v. Sabena, Belgian World Airlines*, 731 F.2d 909 (D.C.Cir.1984). At present they are no more than non-party witnesses, entitled to have their pending motion adjudicated in accordance with the present state of the litigation. Should either or both movants become parties defendant in the future, then any necessary pre-trial discovery may be obtained directly through the exercise of the powers of the district court in which the above entitled action is pending.

These subpoenas presently before this Court are extremely broad and burdensome as drafted. Although apparently intended only to elicit evidence for purposes of trial to demonstrate such pressuring or collusion with regard to Midland and Montagu in their capacity as potential lenders to Laker, the demands extend as well to all papers relating to Sir Freddie Laker personally. A Midland subsidiary has provided banking services to Sir Freddie Laker for, we are told, in excess of 30 years, generating a lot of paper. Midland, for its part, and Montagu deny that they were pressured, and attribute the failure to make the loan to the continuous deterioration of the airline industry generally, and Laker in particular in the latter part of 1981.

This Court concludes that the subpoenas must be vacated for a number of reasons. Foremost among them is the fact that all of Midland's activities in connection with this matter took place solely in the United Kingdom, and Midland's New York branch office had no involvement whatsoever with Laker. This point is not disputed at the hearing. The fact is that the New York branch of Midland did not open until April 1983, long after the alleged antitrust violations sued on in the District of Columbia. Similarly Montagu does not have a branch office in this District; it has a "representative office" which conducts no banking operations in New York. Here again there are no files or documents in the New York Representative Office of Montagu concerning Laker and no person at that office has any knowledge of the matters concerning Laker. That office also was not opened in New York until long after the events complained of by Laker in the District of Columbia action. Essentially then the deposition subpoenas *duces tecum* seek to require Midland and Montagu, by officers having custody in the United Kingdom to produce in New York for use in the District of Columbia litigation, documents and records regularly maintained at their home offices in London. This is inappropriate. *See generally Ings v. Ferguson*, 282 F.2d 149 (2d Cir.1960); *First National City Bank of New York v. Internal Revenue Service*, 271 F.2d 616 (2d Cir.1959); *Cates v. LTV Aerospace Corp.*, 480 F.2d 620 (5th Cir.1973); and *Elder-Beerman Stores Corp. v. Federated Dept. Stores, Inc.*, 45 F.R.D. 515 (S.D.N.Y.1968) (by then District Judge Mansfield), which continue to reflect the law applicable to non-parties.

As a second reason to vacate, this Court finds that the service of the subpoenas in New York is a transparent attempt to circumvent the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, codified at 28 U.S.C. § 1871 (hereinafter the "Hague Convention"), which sets forth agreed international procedures for seeking evidence in this Court from non-parties abroad.

The failure to use the Hague Convention is more than a mere technicality. The extraterritorial jurisdiction asserted over foreign interests by the American antitrust laws has long been a sore point with many foreign governments, including that of the United Kingdom. The English Protection of Trading Interests Act of 1980. ("PTIA") authorizes and empowers the Secretary of State for Trade and Industry to interpose the official power of the British Government so as to prevent persons conducting business in the United Kingdom from complying with foreign judicial or regulatory provisions designated by the Secretary of State as intrusive upon the sovereignty of that nation.

With respect to the District of Columbia *Laker* action, the Secretary has already issued one directive that "no person or persons in the United Kingdom shall comply, or cause or permit compliance, whether by themselves, their officers, servants or agents, with any requirement to produce or furnish to the district court any commercial document in the United Kingdom or any commercial information ...." That the entire *Laker* litigation situation is a matter of sensitive international interest also is emphasized by the determination of the Department of Justice of the United States, announced November 20, 1984 to refrain from initiating civil or criminal antitrust action with respect to the refinancing aspect of the collapse of Laker, and the publicly announced determination on November 19, 1984 by the President that the grand jury investigating Laker antitrust violations in the District of Columbia since June 1983 should terminate its inquiry for "foreign policy reasons."

Implicit in the concerns expressed by the British Government is the notion that the British bureaucracy had the power to consider and investigate all tariffs on international routes flying in and out of the United Kingdom with respect to which the predatory pricing was allegedly conducted, with the power to disapprove such fares, but did not exercise its power, accordingly the allegations against "predatory pricing" in the American antitrust suit brought by Laker,

challenge indirectly the validity and indeed the honesty of decisions of the British Government with respect to tariff decisions made in exercise of the sovereignty of the British Government. The power of the British Government to regulate such matters, presumably in the interests of its own nationals, is clearly recognized by international treaty and agreements. The validity of the antitrust claims being made in the District of Columbia are of course of no direct concern to this Court. However, the very real problems presented by the PTIA are cited to demonstrate that the attempt to effect the subpoena duces tecum in this District is in effect an end run, not only around the Hague Convention, but also an end run on the PTIA. In effect, this Court is being asked to aid the plaintiff in the District of Columbia in obtaining an order from this Court which would cause the Midland branch in New York and the Montagu agency to compel their principals in London to violate British law by disgorging in London and transferring to their New York offices, documents which plaintiff would like to see, none of which are now or ever were located in New York. This is clearly an improper abuse of the subpoena power of this Court, and should not be permitted.

In reaching the foregoing conclusion we need not consider whether the Hague Convention is always the exclusive method of discovery against a non-party, nor do we consider the case where the discovery is sought from a party plaintiff, *cf. Coface v. Phillips Petroleum Co.*, 81 Civ. 4463–JFK (S.D.N.Y. December 11, 1984), or even from a defendant.

Both motions are granted, and the subpoenas are each vacated. No costs.

So Ordered.