**FIRST AMERICAN CORPORATION and First American Bankshares, Inc., Petitioners–Appellees–Cross–Appellants,**

v.

**PRICE WATERHOUSE LLP, a limited liability partnership registered under the laws of the State of Delaware, Respondent–Cross–Appellee,**

Price Waterhouse United Kingdom Firm, a partnership organized under the laws of England, United Kingdom, Respondent–Appellant–Cross–Appellee.

Docket Nos. 98–7500(L), 98–7529(XAP).

United States Court of Appeals, Second Circuit.

Argued June 10, 1998.

Decided July 14, 1998.

---

**7.** In view of the conclusion we reach, we need not address the applicability of § 1415(e)(4)(D).

Christopher F. Dugan, Washington, D.C. (Stephen J. Brogan, Washington, D.C., Stephen C. Bennett, New York, NY, Jones, Day, Reavis & Pogue, on the brief) for Petitioners–Appellees–Cross–Appellants.

James E. Tolan, New York, NY (William K. Dodds, Peter L. Critchell, Amianna Stovall, Dechert Price & Rhoads, on the brief) for Respondent–Appellant–Cross–Appellee.

Edwin G. Schallert, New York, NY (Barton Legum, Faune P. Devlin, Debevoise & Plimpton, on the brief) for Respondent–Cross–Appellee.

Before: NEWMAN, JACOBS, and PARKER, Circuit Judges.

JACOBS, Circuit Judge:

This appeal, heard on an expedited basis, reviews orders of the United States District Court for the Southern District of New York (Sweet, *J.*) enforcing a non-party witness subpoena against a United Kingdom accounting partnership, and finding the firm in contempt for failure to comply.

In the several years leading up to the collapse of the Bank of Commerce and Credit International ("BCCI"), Price Waterhouse United Kingdom Firm ("PW–UK") was its worldwide auditor. In accordance with its normal practice, PW–UK was assisted in these audits by Price Waterhouse partnerships in other countries. Those firms, which include the American firm, Price Waterhouse LLP ("PW–US"), as well as Price Waterhouse (Cayman) and Price Waterhouse (Luxembourg), examined the BCCI entities in their respective locales and supplied the information requested by PW–UK for inclusion in the consolidated financial statements that PW–UK prepared.

Two companies alleged to have been acquired surreptitiously by BCCI—First American Corporation and First American Bankshares ("First American")—commenced an action relating to the BCCI debacle in the United States District Court for the District of Columbia; the relevant discovery period in that action is currently scheduled to end on August 11, 1998. In aid of discovery in its District of Columbia action, First American sought a subpoena pursuant to Fed.R.Civ.P. 45 from the United States District Court for the Southern District of New York, directing, *inter alia,* that PW–UK produce what PW–UK represents to be a great quantity of documents. Judge Sweet concluded that jurisdiction over PW–UK is well-founded because that partnership "does business" in New York, within the meaning of N.Y. C.P.L.R. § 301, through the affiliated partnership of PW–US.

On appeal, PW–UK argues that (1) PW–UK is not "doing business" in New York, because PW–US is not its agent, is a distinct entity, and lacks power to bind PW–UK; (2) the exercise of personal jurisdiction over PW–UK violates due process; and (3) First American should be compelled to resort first to the Hague Convention, so that a British court can decide in the first instance the propriety of this disclosure. On its cross-appeal, First American argues that the district court erred insofar as it failed to credit

its theory that Price Waterhouse is a worldwide partnership, or that such a partnership was created by reason of estoppel.

On June 23, 1998, we affirmed the orders of the district court, issued our mandate forthwith, and stated that our opinion would follow. We conclude that the district court properly exercised personal jurisdiction over PW–UK, although we rely on a different rationale.

## BACKGROUND

The orders reviewed on this appeal were issued in aid of discovery in an action pending in the United States District Court for the District of Columbia, *First American Corp. et al. v. Sheikh Zayed Bin Sultan Al-Nahyan,* 1998 WL 405057, in which First American (by its trustee in liquidation) alleges that the defendants conspired illegally to acquire First American using funds provided by BCCI and related entities. The four remaining defendants in that action include two former officers of First American (Clark M. Clifford and Robert A. Altman) and two former shareholders. First American alleges claims for fraud, civil RICO violations, breach of fiduciary duty, reckless and negligent misconduct, and civil conspiracy. The net proceeds of any damage award or settlement are to be distributed by its trustee to the United States (pursuant to an order of forfeiture entered against BCCI in a criminal RICO action) and to the Federal Reserve Board (pursuant to settlement agreements).

Discovery between and among the parties in the District of Columbia action began in September 1995; third-party discovery began early in 1996. In September 1996, First American served a subpoena for documents on "Price Waterhouse," which was defined to include Price Waterhouse (U.K.), Price Waterhouse (Cayman) and Price Waterhouse (Luxembourg). Only PW–US responded to the subpoena. Based on its responses, First American took the depositions of three PW–US partners.

In August 1997, First American served three copies of a new document subpoena seeking production of documents from "Price Waterhouse, the worldwide accounting firm."

Again, that term was expressly defined to include PW–UK. One copy was served in New York on the Manhattan office of PW–US. The other two were addressed to "Price Waterhouse c/o Clive D.J. Newton," and served on Mr. Newton, a PW–UK partner who had been seconded to PW–US, worked out of the Manhattan office of PW–US, and was living in Connecticut. Mr. Newton was served with one copy at his home in Connecticut and the other at the PW–US office in New York.

Once again, the only response was by PW–US, which refused to produce any documents of the so-called "worldwide accounting firm," or the constituent parts identified in the subpoena definitions.

The district court record does not contain any proof of service with respect to the subpoenas served on Mr. Newton, of which the one served in New York is of particular importance. In response to a request by the panel, (i) First American supplied an affidavit dated June 11, 1998 from process-server James Walker, who attests to delivering a copy of the subpoena to Mr. Newton by hand in the Manhattan office building of PW–US on August 28, 1997, and (ii) PW–UK acknowledged that Mr. Newton received the subpoena in the manner, at the place, and at the time specified in Mr. Walker's affidavit.

First American filed a Petition to Compel in the district court on September 29, 1997. On December 17, 1997, Judge Sweet found that PW–UK's coordinated activities with and through PW–US in New York were sufficient to sustain jurisdiction. With respect to First American's theory of worldwide partnership by estoppel, the court determined that while Price Waterhouse may have represented *to BCCI* that it was a worldwide partnership, and that *BCCI* may have relied on that representation, First American cannot claim estoppel because there is insufficient evidence to show *First American* itself had placed reliance on any of the representations at issue. The court found that the subpoena served upon Newton in Connecticut did not confer jurisdiction upon a court in New York, and indicated that in any event due process would not be satisfied even if the subpoena had been served upon Newton in

New York. No ruling was made either on First American's theory that Price Waterhouse is a "worldwide partnership in fact", or on First American's request for discovery addressed to that issue.

On January 7, 1998, PW–US and PW–UK moved for reconsideration. The district court made additional findings that PW–UK was doing business in New York at the jurisdictionally significant time (that is, at the time the subpoena was served, *cf. Darby v. Compagnie National Air France*, 735 F.Supp. 555, 560 (S.D.N.Y.1990) (finding relevant time for jurisdictional purposes to be when complaint is filed)), and again ordered PW–UK to produce the requested documents.

On April 3, 1998, Judge Sweet found that PW–UK was in contempt of court for its failure to comply with the subpoena, and ordered it to pay $1,000 per day as a sanction, but (upon the parties' stipulation) stayed the sanction pending appeal.

We affirmed on June 23, 1998, with opinion to follow, and now explain our reasons.

## DISCUSSION

*A. Personal Jurisdiction*

The district court focused the personal jurisdiction inquiry on whether PW–UK, acting through the affiliated partnership of PW–US, "does business" in New York within the meaning of N.Y. C.P.L.R. § 301. This is a vexed question, which turns in part on the complex, possibly unique, and sharply disputed issue of how the Price Waterhouse accounting firms around the world relate to each other. We do not reach that question, because we see a more straightforward avenue to the exercise of personal jurisdiction over PW–UK.

■ Section 310(a) of the C.P.L.R. provides that:

> Personal service upon persons conducting a business as a partnership may be made by personally serving the summons upon any one of them.

N.Y. C.P.L.R. § 310(a) (McKinney Supp. 1997–98). One commentator has pointed out the absence of any additional requirement that a partnership be doing business in New York, and attributes that omission to the fact that a partnership (unlike a corporation) has no separate existence. Joseph M. McLaughlin, N.Y. C.P.L.R. § 310, Practice Commentaries, at 371 (McKinney 1990). Section 310 thus telescopes service and personal jurisdiction into a single inquiry. If valid service is effected on one partner within the state, personal jurisdiction over the partnership is achieved. *See Cooper v. Lubell,* 1987 WL 14468, at *2 (1987) (Keenan, *J.*) (noting that service upon a partner confers personal jurisdiction over the partnership and each partner served).

■ There is no dispute that Mr. Newton was a partner in PW–UK in August 1997. And the undisputed June 11, 1998 affidavit shows that Mr. Newton was served by hand in New York at that time. These facts suffice to confer personal jurisdiction over PW–UK.

PW–UK argues that New York law provides for jurisdiction over a partnership by service on a partner only in the partner's state of residence; because Mr. Newton was a Connecticut resident (although concededly working in New York on a daily basis), PW–UK argues that service upon him in either state cannot subject PW–UK to personal jurisdiction in New York. However, the cases cited by PW–UK, *ITC Entertainment, Ltd. v. Nelson Film Partners,* 714 F.2d 217, 222 n. 5 (2d Cir.1983) and *Bulkley v. O'Donnell,* 148 Misc. 186, 187, 265 N.Y.S. 495, 496 (1933), *aff'd,* 240 A.D. 929, 267 N.Y.S. 983 (3d Dep't 1933), address the residency of a partner (and thus the residency of the partnership) for purposes of C.P.L.R. § 308—a section which presumes an independent basis of jurisdiction and merely concerns the giving of notice to a defendant—and not where or how a partnership can be served under C.P.L.R. § 310. Moreover, C.P.L.R. § 308 provides that sufficient notice is supplied by service upon an individual within New York.

PW–UK intimates (without actually arguing) that because the August 1997 subpoena was addressed to "Price Waterhouse" rather than to PW–UK, the only entity (if any) that could be subjected to personal jurisdiction by

that subpoena is the alleged "worldwide partnership," which according to PW–UK does not exist. However, the subpoena expressly defines the words "Price Waterhouse" to include PW–UK (as well as other Price Waterhouse entities), and the subpoena was served on Mr. Newton, indisputably a PW–UK partner. At least in the circumstances presented, where several entities share a common identifying name, the definition section's inclusion of PW–UK sufficed to render that entity a target of the subpoena regardless of the actual relationship or lack of relationship between and among the Price Waterhouse partnerships. Under the circumstances, we do not think PW–UK can reasonably contend that it was oblivious to the fact that it was a target of the subpoena.

## B. Due Process

The district court focused on the subpoena that was served on Mr. Newton in Connecticut, while we focus on the subpoena served on him in New York. We respectfully disagree with the district court's observation that even if service had been accomplished in New York, such service would not comport with due process, because maintenance of the suit would offend "traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158 (1945) (internal quotation marks and citations omitted).

■ We are satisfied that in light of *Burnham v. Superior Court,* 495 U.S. 604, 110 S.Ct. 2105, 109 L.Ed.2d 631 (1990), the assertion of personal jurisdiction over PW–UK based upon service pursuant to C.P.L.R. § 310 satisfies due process. In *Burnham,* the Supreme Court rejected a due process challenge to the assertion of personal jurisdiction over a New Jersey resident who was temporarily in California in connection with activities unrelated to the suit. *Id.* at 628, 110 S.Ct. at 2119 (plurality opinion); *id.* at 640, 110 S.Ct. at 2126 (Brennan, *J.,* concurring in the judgment); *id.* (Stevens, *J.,* concurring in the judgment).

PW–UK argues that *Burnham* should be distinguished on the grounds that PW–UK is a non-U.S. citizen and is a non-party to the underlying suit. We see no reason for such per se distinctions. PW–UK is a non-party, but it is unclear which way that should cut; a person who is subjected to *liability* by service of process far from home may have better cause to complain of an outrage to fair play than one similarly situated who is merely called upon to supply documents or testimony. Further, although a non-party, PW–UK's position as auditor gave it unique access to documents that may be critical in unraveling a bank fraud of unprecedented scale and, perhaps, a correspondingly unique responsibility. At the risk of sounding naive, we think PW–UK could be expected to feel a professional commitment to clearing up the financial frauds that were committed by PW–UK's client and that presumably escaped PW–UK's scrutiny.

Nor does PW–UK command solicitude simply because it is an entity foreign to New York and the United States; in *Kadic v. Karadzic,* 70 F.3d 232, 247 (2d Cir.1995), *cert. denied,* 518 U.S. 1005, 116 S.Ct. 2524, 135 L.Ed.2d 1048 (1996), we upheld the exercise of jurisdiction over a citizen of a foreign country who was served while visiting New York for the purpose of addressing the United Nations.

PW–UK thus fails to distinguish *Burnham;* indeed, Burnham had less reason to expect suit in California than PW–UK had to expect that Newton's presence would subject it to suit in New York. Burnham was briefly in California, mixing pleasure with a business mission unrelated to the subject of the summons. Mr. Newton was in New York working on a prolonged assignment for an affiliated partnership, having been seconded to do so by the PW–UK partnership of which he is a member. And the U.S. affiliate for which Mr. Newton was working had audited BCCI's U.S. subsidiaries (a class to which First American allegedly belonged, although its ownership had been concealed) to assist PW–UK in the preparation of consolidated financial statements.

The rule that service upon a partner in New York subjects a partnership to personal jurisdiction is a venerable one. PW–UK knew, or should have known, that by seconding one of its partners to the New York office

of an affiliate, PW–UK was risking exposure to personal jurisdiction in New York. *See Burnham*, 495 U.S. at 635, 110 S.Ct. at 2124 (historical pedigree of transient jurisdiction provides a defendant voluntarily present in a particular state with " 'clear notice that he is subject to suit' in the forum") (quoting *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980)) (alterations omitted). Under the circumstances, due process is not offended by the enforcement of the Rule 45 subpoena against PW–UK.

### C. The Hague Convention

■ PW–UK next argues that, as a matter of law and international comity, First American should be consigned initially to the discovery procedures provided by the Hague Convention on Evidence. The district court disagreed, and so do we. The Hague Convention is not the exclusive means for obtaining discovery from a foreign entity. *Société Nationale Industrielle Aérospatiale v. United States District Court*, 482 U.S. 522, 539–40, 107 S.Ct. 2542, 2553, 96 L.Ed.2d 461 (1987). Nor is the Convention necessarily the means of first resort. *Id.* at 541–42, 107 S.Ct. at 2554–55. The Supreme Court in *Aérospatiale* declined to announce any fixed rule on this subject, at the same time suggesting that concerns of international comity require that "American courts ... take care to demonstrate due respect for any special problem confronted by the foreign litigant on account of its nationality or the location of its operations, and for any sovereign interest expressed by a foreign state." *Id.* at 546, 107 S.Ct. at 2557.

PW–UK contends that primary resort to the Hague Convention is or should be mandatory if the demand for discovery is addressed to a non-party witness. But the Court in *Aérospatiale* was careful to avoid general rules, and Rule 45 draws no distinction between parties and non-parties concerning the scope of discovery. *See* Fed. R.Civ.P. 45, Advisory Comm. Notes ("Paragraph (a)(2) makes clear that the person subject to the subpoena is required to produce materials in that person's control whether or not the materials are located

within the district or within the territory within which the subpoena can be served. *The non-party witness is subject to the same scope of discovery under this rule as that person would be as a party to whom a request is addressed pursuant to Rule 34.*") (emphasis added).

■ PW–UK is on firmer ground in urging that its non-party status is a consideration in the comity analysis. *See, e.g., Gap, Inc. v. Stone Int'l Trading, Inc.*, No. 93 Civ. 0638(SWK), 1994 WL 38651, at *1 (S.D.N.Y. Feb. 4, 1994) (in determining whether to apply Hague Convention's discovery procedures or those of the Federal Rules, "courts commonly look to the status of the person from whom discovery is sought as one factor in determining whether to apply the provisions of the treaty"); *Minpeco, S.A. v. Conticommodity Servs., Inc.*, 116 F.R.D. 517, 526–27 (S.D.N.Y.1987) (Lasker, *J.*) (noting that historically "restrictive" Second Circuit law on ordering disclosure in the face of foreign disclosure laws probably evolved because the cases concerned non-parties and that "it is ... important to focus on the status in the litigation at hand of the party resisting discovery").

However, PW–UK does not show that there is a collision here between the U.K. confidentiality laws and the federal discovery procedures, or that the U.S. courts would be infringing the prerogative of a British court to interpret the U.K. laws in the first instance—two factors that we believe heavily influenced courts that have restricted discovery in the way PW–UK urges. In *Laker Airways Ltd. v. Pan American World Airways*, 607 F.Supp. 324 (S.D.N.Y.1985), for example, the court vacated subpoenas that it viewed as a transparent effort to circumvent British laws proscribing disclosure of the bank records sought. *Id.* at 326–27. Similarly, in *Ings v. Ferguson*, 282 F.2d 149 (2d Cir.1960), this Court deferred to a Canadian court for initial consideration of whether particular bank records were barred from disclosure under Canadian law, and held that it would allow the plaintiff to issue a subpoena in the future "[o]nly if, despite a ruling [by the Canadian courts] that production of the records or sending them outside the country

would not be illegal, [there] were ... a refusal to make such records available." *Id.* at 153.

The district court here has done what comity requires in this case. The court identified four factors deemed relevant in *Minpeco* for gauging the reasonableness of foreign discovery: (i) the competing interests of the nations whose laws are in conflict; (ii) the hardship that compliance would impose on the party or witness from whom discovery is sought; (iii) the importance to the litigation of the information and documents requested; and (4) the good faith of the party resisting discovery. *Minpeco,* 116 F.R.D. at 523. The district court found that principles of comity weighed in favor of enforcement of the subpoena. In making that determination, the court specifically found that the confidentiality obligations imposed by foreign law here were not absolute, and that disclosure is permitted under British law when either (a) disclosure is under compulsion of law or (b) there is a duty to the public to disclose. The British court in *Price Waterhouse v. BCCI Holdings (Luxembourg) SA,* Chancery Division [1992] BCLC 583, has ruled that the duty of confidentiality under U.K. law is outweighed by a countervailing public interest in the exposure of fraud:

> The courts have, however, always refused to uphold the right to confidence when to do so would be to cover up wrongdoing. In *Gartside v. Outram,* (1856) 26 .LJ Ch 113[,] it was said that there could be no confidence in iniquity. This approach has been developed in the modern authorities to include cases in which it is in the public interest that the confidential information should be disclosed.

*First American Corp. v. Price Waterhouse LLP,* 988 F.Supp. 353, 365 & n. 6. (S.D.N.Y. 1997). A letter of request served by First American in the same underlying lawsuit has been the subject of enforcement proceedings in Britain. The letter of request sought the testimony and documents of specific PW–UK partners. The English court refused to enforce the letter of request, because First American was seeking pretrial discovery not provided for under the Hague Convention or British law, but indicated that neither the customer injunctions cited by PW–UK nor the confidentiality laws of the Cayman Islands (arguably more stringent than the U.K. law) presented any barrier to· production of the requested documents. If, however, PW–UK is prohibited by a foreign court from disclosing the requested documents, it can seek an exemption from sanctions under Rule 37. American law permits a party that is unable to comply with a discovery request to present "substantial justification" for its failure to disclose and thereby avoid contempt sanctions. Fed.R.Civ.P. 37(c)(1). *See Fonseca v. Regan,* 734 F.2d 944, 948 (2d Cir.1984) ("[W]here the information sought is not properly discoverable, it is axiomatic that a district court should not impose a Rule 37 sanction for a party's failure to comply with an order to reveal such information."), *cert. denied,* 469 U.S. 882, 105 S.Ct. 249, 83 L.Ed.2d 186 (1984).

Given these safeguards, we find entirely reasonable the district court's determination that the U.S. interest in this lawsuit outweighs the competing foreign interests in enforcement of local confidentiality laws. Although First American seeks these documents in connection with a private civil suit, that· suit is infused with the public interest, because the U.S. will receive the proceeds of any award or settlement reached in the action. Moreover, the foreign courts have already had the opportunity to address the scope of the confidentiality laws and have held that the interest in enforcement of those laws gives way to the overwhelming public interest in uncovering the enormous BCCI frauds. We think that there is no risk that an American court will commit an error in interpreting foreign law and no reason to favor the Hague Convention over Rule 45.

Assuming that the foreign courts impose no bar on disclosure, as seems likely, no collision will take place between U.S. and foreign law of the kind that influenced the *Laker Airways* and *Ings* courts. If such a conflict does arise, however, Rule 37 would offer PW–UK adequate protection—when and if that protection becomes necessary, and to the extent that the district court was disposed to release PW–UK from its stipula-

tion to entry of the order of contempt. Refusal to enforce the subpoena would be an overreaction to a problem that has yet to arise and may well never arise.

Further, the Hague Convention does not really offer a meaningful avenue of discovery in the present case. *See Aérospatiale*, 482 U.S. at 542–44, 107 S.Ct. at 2555–56 (court must examine likelihood that resort to Hague procedures will prove ineffective; Hague procedures need not be used where they would be "unduly time consuming and expensive, as well as less certain to produce needed evidence than direct use of the Federal Rules"). Pursuant to Article 23 of the Hague Convention, which allows signatory countries to restrict pretrial discovery of documents, the U.K. permits pretrial discovery only if each document sought is separately described. Because First American very plausibly contends that such specificity is impossible in the present case, the Hague Convention would prove an ineffective tool for First American's purpose. The actions already taken by the British courts on First American's previous letters of request confirm that the Hague Convention procedures will not afford access to documents that would be available under the Federal Rules and that may prove important for the prosecution of First American's claims.

We decline PW–UK's invitation to adopt a rule mandating primary resort to the Hague Convention as the means of obtaining discovery from a foreign non-party witness. The circumstances of this case favor enforcement of the subpoena because: (1) there is no collision between the American discovery rules and the British confidentiality laws; (2) the British courts have had the opportunity to determine the scope of their nondisclosure law in the first instance and have concluded that it poses no obstacle to discovery here (and, in the event that a foreign court imposed a bar on disclosure, PW–UK would then be able to present substantial justification for its noncompliance and thus avert sanctions); and (3) exclusive resort to the Hague Convention would unduly limit First American's access to potentially critical documents.

### D. Breadth of the Subpoena

█ Finally, PW–UK argues that the district court erred in deciding that the subpoena was not overbroad. Specifically, PW–UK contends that the court abused its discretion by ruling that "[d]iscovery in any action in the wake of such extended and complicated misdoings will be commensurately extensive." Essentially, the subpoena requires Price Waterhouse to turn over those documents that relate to BCCI's acquisition or ownership interest in First American—the precise subject matter of the underlying litigation. Thus, the more PW–UK argues that the subpoena describes a great volume of its documents, the more PW–UK underlines the importance of its cache of documents to the discovery process. The costs of production may be great, but PW–UK either has not sought a protective order to shift that cost to First American, or PW–UK has not contested the denial of such an application on this appeal. This request may be burdensome, but PW–UK has not convinced the district court, or us, that the burden is undue.

### CONCLUSION

PW–UK is subject to jurisdiction in New York because First American validly served a PW–UK partner in New York. The exercise of personal jurisdiction on this basis is consistent with due process, because long established jurisdictional principles now embodied in C.P.L.R. § 310 provided PW–UK with clear notice that it risked suit in New York when it sent its partner to work at the New York office of PW–US. Further, the PW–UK partner in question was no casual visitor; he was in New York on a daily basis, performing work for an affiliate that prepared audits that became part of the consolidated financials PW–UK provided to its client, BCCI.

We also reject PW–UK's arguments as to the primacy of the Hague Convention; the circumstances of this case provide no basis for preferring the Hague Convention over Rule 45. We further hold that the district court did not abuse its discretion in determining that the subpoena at issue is not overbroad.

As to the cross-appeal, First American proffers no good reason why we should reverse the district court's finding that First American cannot invoke the principle of estoppel because there is insufficient evidence to show that First American itself relied on any representation that Price Waterhouse is or operates as a "worldwide partnership." The district court did not rule on whether Price Waterhouse is a "worldwide partnership in fact," and we decline to rule on the question in the first instance.

The district court's orders are affirmed.